[No. C054868. Third Dist. Nov. 19, 2008.]

MISSION HOSPITAL REGIONAL MEDICAL CENTER et al., Plaintiffs and Appellants, v. SANDRA SHEWRY, as Director, etc., Defendant and Appellant. KAISER FOUNDATION HOSPITALS et al., Plaintiffs and Appellants, v. SANDRA SHEWRY, as Director, etc., Defendant and Appellant.

## Counsel

Hooper, Lundy & Bookman, Lloyd A. Bookman, Byron J. Gross, Jordan B. Keville and Felicia Y. Sze for Plaintiffs and Appellants.

Edmund G. Brown, Jr., Attorney General, Douglas M. Press, Assistant Attorney General, Julie Weng-Gutierrez and Anthony V. Seferian, Deputy Attorneys General, for Defendant and Appellant.

## Opinion

**NICHOLSON, J.**—We enter here into the arcane world of Medicaid law to answer a fundamental question: does a federal statute imposing notice and comment requirements apply to actions taken or mandated by a state legislature? In 2004, the California Legislature, as part of adopting a state budget after the constitutional budget deadline had expired, proposed and enacted over only a three-day period a freeze on the rates the state would use to reimburse certain hospitals that provided services to Medicaid beneficiaries

during the state's 2004–2005 fiscal year. A large number of those hospitals sued for writ relief, claiming the state's action violated federal Medicaid statutes that require a public notice and comment period as part of the process used when revising rates and rate methodologies and that impose substantive findings necessary to support those rates.

The trial court disagreed with the hospitals except to the extent the freeze affected services rendered prior to the freeze's enactment. Both the hospitals and the state department responsible for administering the Medicaid program appealed. We conclude the federal statute requiring notice and comment procedures applied to the state's action, and that the state's process did not satisfy the federal statute. We reverse the trial court's judgment on that basis.

## STATUTORY BACKGROUND

A. *Federal law*

"The Medicaid program was created in 1965, when Congress added Title XIX to the Social Security Act, 79 Stat. 343, as amended, 42 U.S.C. § 1396 *et seq.* . . . [, the Medicaid Act], for the purpose of providing federal financial assistance to States that choose to reimburse certain costs of medical treatment for needy persons. Although participation in the Medicaid program is entirely optional, once a State elects to participate, it must comply with the requirements of Title XIX." (*Harris v. McRae* (1980) 448 U.S. 297, 301 [65 L.Ed.2d 784, 794, 100 S.Ct. 2671].) "As a participant in the federal Medicaid program, the State of California has agreed to abide by certain requirements imposed by federal law in return for federal financial assistance in furnishing medical care to the needy." (*Olszewski v. Scripps Health* (2003) 30 Cal.4th 798, 804 [135 Cal.Rptr.2d 1, 69 P.3d 927] (*Olszewski*).)

Congress enacted the Medicaid Act pursuant to its power under the federal Constitution's spending clause. (U.S. Const., art. I, § 8, cl. 1; *Independent Living Ctr. of Southern Cal. v. Shewry* (9th Cir. 2008) 543 F.3d 1050.) The Medicaid Act is enforceable against conflicting state laws and actions pursuant to the federal Constitution's supremacy clause. (543 F.3d 1050; U.S. Const., art. VI, cl. 2.)

To qualify for federal assistance, a state must submit to the secretary of the federal Department of Health and Human Services (Secretary) for approval a "plan for medical assistance" (42 U.S.C. § 1396a(a)) that contains a comprehensive written statement describing the nature and scope of the state's

Medicaid program.[1] (42 C.F.R. § 430.10 (2008).) Once approved by the Secretary, the state plan enables the state to receive federal funding. The plan is in effect in all political subdivisions of the state. (42 U.S.C. §§ 1396, 1396a(a)(1).)

The state must amend its state plan to reflect "[m]aterial changes" in state policy or in the state's operation of the Medicaid program. (42 C.F.R. § 430.12(c)(1)(ii) (2008).) Amendments approved by the state must also be approved by the Secretary. (42 C.F.R. §§ 430.10, 430.12 (2008).)

In the plan, the state creates or designates a single state agency to administer, or supervise the administration of, the plan. (42 U.S.C. § 1396a(a)(5).) The state plan is mandatory upon that agency. (42 U.S.C. § 1396a(a)(1).)

One of the mandatory provisions in the state plan concerns the rates by which the state will reimburse health care providers for their services to Medicaid patients. The state plan must establish "a scheme for reimbursing health care providers for the medical services provided to needy individuals." (*Wilder v. Virginia Hospital Assn.* (1990) 496 U.S. 498, 501 [110 L.Ed.2d 455, 462, 110 S.Ct. 2510].) The plan must "specify comprehensively the methods and standards" the state will use to set reimbursement rates. (42 C.F.R. § 447.252(b) (2008).)

The Medicaid Act contains two requirements at issue here that apply to the state plan's rate setting provision: subdivisions (a)(13)(A) and (a)(30)(A) of section 1396a of title 42 of the United States Code (section (13)(A) and section (30)(A)). In general, section (13)(A) imposes procedural requirements the state must follow when establishing reimbursement rates, and section (30)(A) imposes substantive findings the state must make when establishing rates. We review section (13)(A) first.

1. *Section (13)(A)*

 a. *Former statute*

Prior to 1997, section (13)(A) imposed a substantive requirement on the states' establishment of reimbursement rates. Former section (13)(A) required the state plan to provide for payment for services through the use of rates that were "reasonable and adequate to meet the costs which must be incurred by

---

[1] The Centers for Medicare and Medicaid Services (CMS), formerly known as the Health Care Financing Administration, is the federal agency responsible for Medicaid. The Secretary oversees the work of CMS. For ease of discussion, we refer to these entities collectively as the Secretary throughout this opinion.

efficiently and economically operated facilities . . . ." (Former § (13)(A) (1985).) States were required to provide the Secretary with assurances that their rates satisfied this substantive requirement. This provision was known as the "Boren Amendment" (see *Evergreen Presbyterian Ministries Inc. v. Hood* (5th Cir. 2000) 235 F.3d 908, 919, fn. 12 (*Evergreen*), overruled on a different ground in *Equal Access for El Paso, Inc. v. Hawkins* (5th Cir. 2007) 509 F.3d 697, 704), and we refer to it as the Boren Amendment to distinguish it from the current version of section (13)(A).

■ A corresponding regulation, 42 Code of Federal Regulations part 447.205 (2008) (part 447.205), imposes notice requirements the state must follow in developing reimbursement rates. (As will be explained shortly, although the Boren Amendment has been repealed, pt. 447.205 has not been repealed.) Under part 447.205, the state agency must provide public notice of "any significant proposed change in its methods and standards for setting payment rates for services." (Pt. 447.205(a).) The notice must describe the proposed change in methods and standards, explain why the agency is changing the methods and standards, state where written comments may be received, and, if there are public hearings on the proposal, give the locations, dates and times of the hearings. (Pt. 447.205(c).) The notice must be published "before the proposed effective date of the change," and it must appear in a state register or certain newspapers of large circulation. (Pt. 447.205(d).)[2]

### b. *Current statute*

In 1997, Congress repealed the Boren Amendment. (Pub.L. No. 105-33, § 4711(a)(1) (Aug. 5, 1997) 111 Stat. 251, 507.) The Boren Amendment's substantive standards had generated significant amounts of litigation, resulting in higher Medicaid costs. Congress repealed the Boren Amendment " 'to

---

[2] Part 447.205 reads in full: "(a) When notice is required. Except as specified in paragraph (b) of this section, the agency must provide public notice of any significant proposed change in its methods and standards for setting payment rates for services.

"(b) When notice is not required. Notice is not required if—

"(1) The change is being made to conform to Medicare methods or levels of reimbursement;

"(2) The change is required by court order; or

"(3) The change is based on changes in wholesalers' or manufacturers' prices of drugs or materials, if the agency's reimbursement system is based on material cost plus a professional fee.

"(c) Content of notice. The notice must—

"(1) Describe the proposed change in methods and standards;

"(2) Give an estimate of any expected increase or decrease in annual aggregate expenditures;

"(3) Explain why the agency is changing its methods and standards;

"(4) Identify a local agency in each county (such as the social services agency or health department) where copies of the proposed changes are available for public review;

"(5) Give an address where written comments may be sent and reviewed by the public; and

provide States with greater flexibility in setting provider reimbursement rates under the Medicaid Program.' [Citation.]" (*Evergreen, supra,* 235 F.3d at p. 919, fn. 12.)

In place of the Boren Amendment's substantive standard, Congress adopted procedural requirements applicable to setting reimbursement rates for certain health care services, including inpatient hospital services. Current section (13)(A) now requires the state plan to provide for a "public process" for determining rates of payment. The public process must provide that:

"(i) proposed rates, the methodologies underlying the establishment of such rates, and justifications for the proposed rates are published,

"(ii) providers, beneficiaries and their representatives, and other concerned State residents are given a reasonable opportunity for review and comment on the proposed rates, methodologies, and justifications, [and]

"(iii) final rates, the methodologies underlying the establishment of such rates, and justifications for such final rates are published . . . ." (§ (13)(A)(i)–(iii).)

"Broadly speaking, subsection (13)(A) requires something on the order of notice and comment rulemaking for states in their setting of rates for reimbursement of 'hospital services . . .' provided under the Medicaid Act." (*Long Term Care Pharmacy Alliance v. Ferguson* (1st Cir. 2004) 362 F.3d 50, 54 (*Long Term Care*).)

In a 1997 letter to state Medicaid directors, the Secretary stated section (13)(A)'s intent "is to provide states with maximum possible flexibility, as well as to minimize [the Secretary's] role in reviewing inpatient hospital and long-term care state plan amendments involving payment rate changes. [The Secretary] would consider the state to be in compliance with this provision if it elected to use a general administrative process similar to the Federal Administrative Procedures Act that satisfies the requirements for a public process in developing and inviting comment in [section (13)(A)]. This will allow states the flexibility to follow current state public procedures. If a

---

"(6) If there are public hearings, give the location, date and time for hearings or tell how this information may be obtained.

"(d) Publication of notice. The notice must—

"(1) Be published before the proposed effective date of the change; and

"(2) Appear as a public announcement in one of the following publications:

"(i) A State register similar to the Federal Register.

"(ii) The newspaper of widest circulation in each city with a population of 50,000 or more.

"(iii) The newspaper of widest circulation in the State, if there is no city with a population of 50,000 or more."

state's public process is not currently being applied to rate setting, or does not currently include a comment period, then the state would need to modify the process."

The Secretary interpreted section (13)(A)'s use of the term "publish" to mean " 'made public,' rather than a more narrow definition that would require states to issue an actual written publication to meet the new public process requirements."

There are apparent differences between the requirements of the current section (13)(A) and part 447.205, the regulation that was adopted to provide procedures for the Boren Amendment and has not been replaced. Section (13)(A) imposes fewer specific requirements on the content of the notice. However, it requires notice be given whenever new rates or methodologies are proposed. In contrast, the notice requirements of part 447.205 are triggered when the agency proposes a "significant" change in its methods for setting rates.[3]

### 2. *Section (30)(A)*

■ A second provision of the Medicaid Act relevant to this case, section (30)(A), applies to a state plan's rate setting scheme. Section (30)(A) imposes both procedural and substantive requirements on states when they set reimbursement rates for hospital services provided to Medicaid beneficiaries. Designed to guarantee beneficiaries both high quality of care and equal access to care, section (30)(A) requires the state plan to provide "such methods and procedures" relating to payment for services under the state plan as may be necessary "to assure that payments are consistent with efficiency, economy, and quality of care and are sufficient to enlist enough providers so that care and services are available under the plan at least to the extent that such care and services are available to the general population in the geographic area . . . ." (§ (30)(A).)

Section (30)(A) "includes a set of substance goals for the 'methods and procedures' including the enlistment of enough providers to furnish service generally available in the community." (*Long Term Care, supra*, 362 F.3d at p. 56.)

As a result of section (30)(A), when the state seeks to modify its reimbursement rates, it must consider efficiency, economy, quality of care,

---

[3] In 1999, the Secretary proposed new regulations to account for the Boren Amendment's repeal and section (13)(A). In her notice, the Secretary expressed the opinion that the notice procedures required by part 447.205 had been superseded by section (13)(A) as it applied to institutional providers, such as plaintiffs here. (64 Fed.Reg. 54263, 54264 (Oct. 6, 1999).) However, the Secretary later withdrew the proposed regulations. (66 Fed.Reg. 25387, 25471 (Feb. 22, 2001).)

and equality of access, and it must rely on responsible cost studies as a basis. (*Orthopaedic Hosp. v. Belshe* (9th Cir. 1997) 103 F.3d 1491, 1496; but cf. *Rite Aid of Pennsylvania, Inc. v. Houstoun* (3d Cir. 1999) 171 F.3d 842, 851–852 [§ (30)(A) does not require any particular procedure for meeting its substantive goals].) Moreover, "[i]t is not justifiable . . . to reimburse providers substantially less than their costs for purely budgetary reasons. [Citations.]" (*Orthopaedic Hosp. v. Belshe, supra,* 103 F.3d at p. 1499, fn. 3.)

The notice provisions of part 447.205 apply to the state's adoption and change of the methods and procedures it uses for setting rates to ensure quality and equal access. (*Long Term Care, supra,* 362 F.3d at p. 56.)

### B. *State law*

■ California participates in the federal Medicaid program through the Medi-Cal program. (Welf. & Inst. Code, § 14000 et seq.; Cal. Code Regs., tit. 22, § 50000 et seq.) The State Department of Health Care Services (the Department) (formerly the State Department of Health Services) is the state agency charged with administering Medi-Cal in accordance with the state plan. (Cal. Code Regs., tit. 22, § 50004, subd. (b)(1).) Defendant Sandra Shewry serves as the Department's director. (We refer to defendant as the Department.)

The Department reimburses California hospitals for inpatient services they render to Medi-Cal patients in one of two ways: (1) according to a specific contractual rate of payment negotiated between the hospital and an arm of the Department, the California Medical Assistance Commission (CMAC); or (2) for California hospitals that have not negotiated contracts with CMAC (commonly known as noncontract hospitals), on the basis of costs, in accordance with various regulatory formulas. (Cal. Code Regs., tit. 22, §§ 51536, 51539, 51541, 51546, 51549.) Plaintiffs are noncontract hospitals.

■ The state plan and Department regulations describe the methodology the Department must use to determine reimbursement rates for inpatient services rendered at noncontract hospitals, which we briefly summarize here. (State Medicaid Plan, attachment 4.19-A; Cal. Code Regs., tit. 22, §§ 51545–51556.) The methodology is known as the peer grouping inpatient reimbursement limitation (PIRL). In general, under this methodology, the Department reimburses a hospital for the medical services it provided to Medi-Cal beneficiaries during the hospital's fiscal year based on the lesser of the following four items: (1) customary charges (the hospital's usual or customary charges to the general public); (2) audited "[a]llowable costs" in accordance with Medicare standards and principles of cost-based reimbursement; (3) an all-inclusive rate per discharge limitation, as defined

by regulation; or (4) the so-called peer grouping rate per discharge limitation, also as defined by regulation. (Cal. Code Regs., tit. 22, § 51545, subd. (a)(70)(A)–(D).)

Traditionally, the reimbursement process for noncontract hospitals proceeds as follows: During its fiscal year, a noncontract hospital receives interim reimbursement payments from the Department based on its historical costs. The Department makes these payments as the hospital renders services and submits bills. (Cal. Code Regs., tit. 22, § 51536, subd. (c)(2).)

■ Within five months of the end of its fiscal year, a noncontract hospital submits a cost report to the Department. (42 C.F.R. §§ 413.20(b), 413.24(f) (2008).) The Department reviews the report and prepares a tentative cost settlement based on the hospital's reported costs and the Department's determination of which of those costs are allowable under Medicaid. Based on this tentative settlement, the Department recoups from further payments any overpayment of interim payments and pays the hospital any underpayments.

Within three years of the close of the hospital's fiscal period, the Department completes a field audit and reviews the accuracy of the hospital's reported costs. Upon completing the audit, the Department issues an audit report summarizing the Department's determination of the hospital's allowable costs.

Meanwhile, the Department also determines a hospital's all-inclusive rate per discharge limitation, and its peer grouping rate per discharge limitation for the same fiscal year in accordance with state regulations. (Cal. Code Regs., tit. 22, §§ 51549, 51553.) Following the PIRL methodology, a hospital's final reimbursement for the fiscal period in question is the lesser of the hospital's customary charges, its audited allowable costs, its all-inclusive rate per discharge limitation, or its peer grouping rate per discharge limitation. The Department also reconciles the final settlement with the interim payments to determine if there have been underpayments or overpayments made to the hospital. (Cal. Code Regs., tit. 22, § 51536.)

■ Although the state plan includes a detailed description of the methodology the Department must use to establish rates, it does not specify the public process through which the Department must act. Rather, the plan states simply "[t]he State has in place a public process which complies with the requirements of [section (13)(A)] of the Social Security Act." Also, in a section of the plan governing rates for providers other than inpatient hospitals such as plaintiffs, the plan states that rates "may be adjusted when required by state statute provided that applicable requirements of 42 CFR Part 447 are

met." The notice requirements of part 447.205 discussed above are included within 42 Code of Federal Regulations part 447 (2008).

## FACTS

In 2004, the Legislature adopted a freeze on the reimbursement rates paid to noncontract hospitals for inpatient services during the state's 2004–2005 fiscal year. The bill, Senate Bill No. 1103 (2003–2004 Reg. Sess.), imposed the freeze by modifying the PIRL calculation used for determining a noncontract hospital's final reimbursement.

The freeze provision is found at section 32 of Senate Bill No. 1103 (2003–2004 Reg. Sess.). Section 32 declares "the state faces a fiscal crisis that requires unprecedented measures to be taken to reduce General Fund expenditures." (Stats. 2004, ch. 228, § 32, subd. (a) (Stats. section 32).) The rate freeze at issue here was one such measure.

In general, Stats. section 32 froze reimbursement rates for inpatient services rendered during the 2004–2005 fiscal year by limiting the "allowable costs" component of the PIRL to the hospital's 2003 costs. It did this first by declaring that the maximum reimbursement payment for services rendered in the 2004–2005 fiscal period would be calculated using the " 'as audited' cost per day" for the hospital's fiscal year ending in the 2003 calendar year. (*Ibid.*) Second, Stats. section 32 required that the hospital's cost report settlement for a hospital's fiscal period ending in the 2004–2005 fiscal year would be limited to "the lower of either the hospital's cost per day for inpatient services provided during the 2004–05 fiscal year or the 'as audited' cost per day for the hospital's fiscal period ending in the 2003 calendar year multiplied by the number of inpatient days rendered during the 2004–05 fiscal year." (Stats. § 32, subd. (b)(3)(B).)[4]

Senate Bill No. 1103 (2003–2004 Reg. Sess.) was enacted by the Legislature on July 29, 2004, and the Governor signed the measure into law on August 16, 2004. It became effective immediately as an urgency measure, and it applied retroactively to costs incurred beginning July 1, 2004.

Stats. section 32 allowed the Department to implement the freeze without complying with usual administrative law provisions. It excused the Department from complying with the rulemaking provisions of the Administrative Procedure Act (Gov. Code, § 11340 et seq.), and it authorized the Department to implement the freeze "by means of a provider bulletin, or similar instruction, without taking regulatory action." (Stats. § 32, subd. (e).)

---

[4] Stats. section 32 also cut interim reimbursement rates paid during the 2004–2005 fiscal year by 10 percent. (Stats. § 32, subd. (c).) Plaintiffs do not challenge this provision.

According to the Senate floor analysis, the measure was projected to save the state at least $3.1 million in general fund expenditures. Since the state pays 50 percent of Medi-Cal expenditures and the federal government pays the rest, the measure's projected impact on noncontract hospitals was approximately $6.2 million.[5]

A hospital reimbursement expert retained by plaintiffs estimated the freeze would in the aggregate actually reduce plaintiffs' reimbursement by more than $53 million, or about 14.5 percent of the amount the hospitals would have otherwise received for the 2004–2005 fiscal year had the freeze not been enacted.

## PROCEDURAL HISTORY

Plaintiffs consist of over 100 California hospitals. They filed two petitions for writ of mandate attacking Stats. section 32 pursuant to Code of Civil Procedure section 1085. The two actions were consolidated prior to trial.

Plaintiffs allege Stats. section 32 violates the Medicaid Act in that neither the Legislature nor the Department (1) adopted or implemented Stats. section 32 in compliance with the notice and comment procedures required by section (13)(A); nor (2) did either, prior to Stats. section 32's adoption, conduct any studies or analysis to determine if the measure met the substantive requirements of section (30)(A).

Plaintiffs also allege the Department (3) violated federal Medicaid regulations by not amending the state plan to account for the rate freeze as a "material change" and by not seeking federal approval of such an amendment; (4) violated the federal and state constitutional protections against infringement of contracts by applying Stats. section 32 to services rendered prior to the measure's enactment; and (5) improperly interpreted Stats. section 32 and applied it in violation of its own terms.

The trial court rejected most of plaintiffs' allegations. It found plaintiffs had standing to seek relief in mandamus, but it concluded they were entitled to relief only insofar as the Department had applied Stats. section 32 to services the hospitals had rendered before Stats. section 32 was enacted. It denied the petitions in all other respects.

Plaintiffs and the Department appeal from the trial court's judgment. Plaintiffs claim the trial court wrongly decided against them on their claims

---

[5] According to the Department, noncontract hospitals such as plaintiffs provide only 10 percent of all hospital inpatient days of care provided to Medi-Cal patients. Contract hospitals provide the rest.

of error under section (13)(A), section (30)(A), Medicaid regulations governing amendments to state plans, and the terms of Stats. section 32. The Department claims the court erred in determining the Department's application of Stats. section 32 to services rendered prior to the statute's enactment violated constitutional prohibitions against impairing contracts. The Department also challenges plaintiffs' standing to seek writ relief under the Medicaid Act and implementing state regulations.

## DISCUSSION

### I

### *Standing*

The Department claims plaintiffs lack standing to seek writ relief under the Medicaid Act and its regulations. It asserts plaintiffs cannot establish a clear and present duty on the part of the Department or a clear and beneficial right on the part of plaintiffs to the Department's performance of that duty. We disagree with the Department's contentions. We conclude plaintiffs have standing.

In this section, we discuss the second prong of the test for eligibility to seek mandate, plaintiffs' interest in the Department's performance of duty. The first prong, the existence of a duty, goes to the merits of each of plaintiffs' arguments, which we discuss in subsequent sections.

■ "Code of Civil Procedure section 1085 declares that a writ may be issued 'by any court . . . to any inferior tribunal, corporation, board or person, to compel the performance of an act which the law specially enjoins, as a duty resulting from an office, trust, or station . . . .' The availability of writ relief to compel a public agency to perform an act prescribed by law has long been recognized. (See, e.g., *Berkeley Sch. Dist.* v. *City of Berkeley* (1956) 141 Cal.App.2d 841, 849 [297 P.2d 710] [mandamus appropriate against city auditor to release funds to schools pursuant to city charter provision].)

"What is required to obtain writ relief is a showing by a petitioner of '(1) A clear, present and usually ministerial duty on the part of the respondent . . . ; and (2) a clear, present and beneficial right in the petitioner to the performance of that duty . . . .' (*Baldwin-Lima-Hamilton Corp.* v. *Superior Court* (1962) 208 Cal.App.2d 803, 813–814 [25 Cal.Rptr. 798], citations omitted.) Mandamus is available to compel a public agency's performance or correct an agency's abuse of discretion whether the action being compelled or corrected can itself be characterized as 'ministerial' or 'legislative[.]' " (*Santa*

*Clara County Counsel Attys. Assn. v. Woodside* (1994) 7 Cal.4th 525, 539–540 [28 Cal.Rptr.2d 617, 869 P.2d 1142].)

Indeed, mandamus is available to compel the Legislature's performance where a statute requires the Legislature to act. (See *County of Los Angeles v. State of California* (1984) 153 Cal.App.3d 568, 573 [200 Cal.Rptr. 394] [affirmed issuance of writ of mandate ordering Legislature to appropriate funds in budget to reimburse local governments for certain statutorily mandated costs].) While a court cannot direct how the Legislature exercises its discretion, it can require the Legislature to comply with all laws that govern it or the subject matter on which it is legislating. "[T]he Legislature must not ignore the requirements of existing legislation." (*Ibid.*)

As to plaintiffs' beneficial right in the performance of duty, the Department claims plaintiffs must show that the legislative body enacting the duty intended to confer a substantive, enforceable right on the petitioner to enforce the duty. The Department equates this showing with that required to seek relief under the federal civil rights statute, section 1983 of title 42 of the United States Code. In so doing, the Department misstates California law.

In California, a party who may not have standing to enforce the Medicaid Act under section 1983 of title 42 of the United States Code may still be entitled to enforce the act by means of a writ of mandate under Code of Civil Procedure section 1085 if he is a beneficially interested party under Code of Civil Procedure section 1086. (*Doctor's Medical Laboratory, Inc. v. Connell* (1999) 69 Cal.App.4th 891, 896 [81 Cal.Rptr.2d 829]; *California Homeless & Housing Coalition v. Anderson* (1995) 31 Cal.App.4th 450, 458 [37 Cal.Rptr.2d 639].) "While section 1983 of 42 United States Code requires violation of a private right, privilege, or immunity to confer standing, section 1085 of the California Code of Civil Procedure creates a broad right to issuance of a writ of mandate 'to compel performance of an act which the law specifically enjoins.' Section 1085 'is available not only to those who have enforceable private rights, but to those who are "beneficially interested" parties within the meaning of Code of Civil Procedure section 1086.' [Citation.]" (*Doctor's Medical Laboratory, Inc. v. Connell, supra*, 69 Cal.App.4th at p. 896.)

A beneficially interested party is one who has "some special interest to be served or some particular right to be preserved or protected over and above the interest held in common with the public at large. [Citations.] As Professor Davis states the rule: 'One who is in fact adversely affected by governmental action should have standing to challenge that action if it is judicially reviewable.' (Davis, 3 Administrative Law Treatise (1958) p. 291.)" (*Carsten v. Psychology Examining Com.* (1980) 27 Cal.3d 793, 796–797 [166 Cal.Rptr. 844, 614 P.2d 276].)

The beneficial interest standard is so broad, even citizen or taxpayer standing may be sufficient to obtain relief in mandamus. "[W]here a public right is involved, and the object of the writ of mandate is to procure enforcement of a public duty," a citizen is beneficially interested within the meaning of Code of Civil Procedure section 1086 if "he is interested in having the public duty enforced." (*Citizens Assn. for Sensible Development of Bishop Area v. County of Inyo* (1985) 172 Cal.App.3d 151, 158 [217 Cal.Rptr. 893].)

Plaintiffs are beneficially interested parties. They have an interest in challenging Stats. section 32 and enforcing the Medicaid Act that is above the interest held by the public at large. They are interested in being compensated for the medical services they provide in accordance with the laws and rules established by Congress for the Medicaid program. They seek the enforcement of public duties imposed on the Legislature and the Department by the Medicaid laws. These interests are sufficient to satisfy the beneficial interest prerequisite for obtaining writ relief.[6]

We now turn to examine the duties plaintiffs seek to enforce.

## II

### *Section (13)(A)*

Plaintiffs claim the Department violated a mandatory duty imposed by section (13)(A) to provide a notice and comment process on the rate methodology change contained in Stats. section 32 prior to the statute's adoption. The Department argues, and the trial court held, that administrative law principles contained in section (13)(A) do not apply when the Legislature is the body changing the rates and methodology. We conclude section (13)(A) applied here, and that the adoption and implementation of section 32 did not comply with Stats. section (13)(A)'s notice requirements.

---

[6] We note in passing that plaintiffs may have standing to enforce at least section (13)(A) under section 1983 of title 42 of the United States Code, which of course would certainly satisfy the beneficial interest requirement of Code of Civil Procedure section 1086. (See *American Soc. of Consult. Pharmacists v. Concannon* (D.Me. 2002) 214 F.Supp.2d 23, 28–29 [private right of action exists under 42 U.S.C. § 1983 for medical providers to enforce § (13)(A)'s right to comment on proposed rate changes]; but cf. *In re NYAHSA Litigation* (N.D.N.Y. 2004) 318 F.Supp.2d 30, 38–39 [providers have no right of action to enforce § (13)(A) under 42 U.S.C. § 1983; Congress intended that with repeal of the Boren Amendment, neither § (13)(A) nor any other provision of the Medicaid Act would be interpreted as establishing a cause of action for hospitals regarding the adequacy of the rates they receive].) Plaintiffs likely cannot enforce section (30)(A) under section 1983 of title 42 of the United States Code (*Sanchez v. Johnson* (9th Cir. 2005) 416 F.3d 1051, 1055–1060), but they could seek to enjoin the state's continuing violation of section (30)(A) under the supremacy clause of the federal Constitution. (*Independent Living Center v. Shewry, supra,* 543 F.3d at pp. 1062–1064.)

## A. *Additional background information*

We begin by reviewing Senate Bill No. 1103's (2003–2004 Reg. Sess.) history and the Department's actions after the Governor signed the bill. Senate Bill No. 1103 was introduced in the Senate on January 12, 2004. At that time, the bill was a spot bill for possible use when agreements concerning the state budget were eventually reached. The entire bill read simply: "It is the intent of the Legislature to enact statutory changes relating to the Budget Act of 2004." (Sen. Bill No. 1103 (2003–2004 Reg. Sess.) as introduced Jan. 12, 2004.) The Senate Rules Committee's bill analysis stated the bill was "intended to be used as a budget trailer bill on specific issues when a compromise has been reached." (Sen. Rules Com., Off. of Sen. Floor Analyses, 3d reading analysis of Sen. Bill No. 1103 (2003–2004 Reg. Sess.) May 18, 2004.) The Senate passed the one-line bill on May 19, 2004.

On June 29, 2004, two days before the new fiscal year began and 14 days after the June 15 constitutional deadline for adopting the budget had passed (Cal. Const., art. IV, § 12), the Assembly amended the proposed bill by adding one word. The bill now read it was the Legislature's intent to enact "necessary" statutory changes to the Budget Act of 2004. (Sen. Bill No. 1103 (2003–2004 Reg. Sess.) as amended June 29, 2004, italics omitted.)

Nothing more happened on the bill until July 27, 2004. On that date, about four weeks after the new state fiscal year had begun and six weeks after the constitutional budget deadline had passed, the Assembly struck the bill's single sentence, replaced it with 38 sections totaling 168 pages relating to health care, and declared the bill to be an urgency measure. Stats. section 32 of the newly expanded bill contained the rate freeze. The Assembly passed Senate Bill No. 1103 (2003–2004 Reg. Sess.) the next day, July 28, 2004.

The following day, July 29, Senate Bill No. 1103 (2003–2004 Reg. Sess.) came before the full Senate. The Senate Rules Committee's analysis dated July 29 now described the bill as "the omnibus health trailer bill for the Budget Act of 2004. It contains necessary changes to implement the Budget Act of 2004."[7] (Sen. Rules Com., Off. of Sen. Floor Analyses, Unfinished

---

[7] The Senate floor analysis of July 29, 2004, described the proposed freeze as follows: "Hospital Inpatient Rate. This bill establishes maximum limits for the Medi-Cal reimbursement rate paid to acute care hospitals not under contract with the California Medical Assistance Commission (CMAC) for services provided in the 2004–05 fiscal year. The maximum reimbursement for services provided for 2004–05 shall be calculated using the 'as audited' cost per day, including ancillary costs, for the hospital's fiscal period ending in the 2003 calendar year. The Budget Bill assumes savings of at least $3.1 million (General Fund) from this action." (Sen. Rules Com., Off. of Sen. Floor Analyses, Unfinished Business Analysis of Sen. Bill No. 1103 (2003–2004 Reg. Sess.) as amended July 27, 2004, p. 7.) The Senate third reading bill analysis stated the bill would "[f]reeze[] the Medi-Cal reimbursement rates for

Business Analysis of Sen. Bill No. 1103 (2003–2004 Reg. Sess.) as amended July 27, 2004, p. 1.) The Senate adopted the bill that day.[8]

The Governor approved Senate Bill No. 1103 (2003–2004 Reg. Sess.) on August 16, 2004. The bill became effective that day as an urgency measure, and, of course, applied retroactively to the beginning of the state's 2004–2005 fiscal year.

There is no evidence in the record of any public notice given by the Legislature or the Department during the time period from July 27 to July 29 when the Legislature amended and adopted Senate Bill No. 1103 (2003–2004 Reg. Sess.). Indeed, even the Department's "most knowledgeable person" regarding the enactment of Senate Bill No. 1103 had no knowledge of the Stats. section 32 rate freeze until the bill's enactment.

The Department subsequently provided public notice of Senate Bill No. 1103, but it did so without mentioning the rate freeze contained in Stats. section 32. On September 1, 2004, 33 days after the Legislature adopted Senate Bill No. 1103 (2003–2004 Reg. Sess.) and 16 days after the Governor signed it into law, the Department posted a notice on its Medi-Cal Web site informing the public of Stats. section 32's 10 percent reduction in interim rates. The reduction would be applied to all claims adjudicated on or after that date. This notice said nothing about the rate freeze or its retroactivity.

On September 30, 2004, the Department sent noncontract hospitals a letter explaining the 10 percent reduction in interim rates. In November 2004, the Department published a provider bulletin that also explained the interim rate reduction and the Department's implementation of that provision of Stats. section 32. Neither of these documents mentioned Stats. section 32's rate freeze or its retroactivity.

In a declaration opposing plaintiffs' petition, Frank Vanacore, the Department's chief of the audits review and analysis section, agreed that the Department did not provide any details during this time period concerning how it would implement the rate freeze. It did not do so, according to Vanacore, because the freeze "would not be implemented until well after the close of state fiscal year 2004/2005."

non-contract hospitals for FY 2004–2005 and also reduces their interim rates by 10%." (Sen. Com. on Budget and Fiscal Review, 3d reading analysis of Sen. Bill No. 1103 (2003–2004 Reg. Sess.) as amended July 27, 2004, p. 3.)

[8] On July 27, 2004, another spot bill, Assembly Bill No. 2117 (2003–2004 Reg. Sess.), had been amended in the Senate to include for the first time the same provisions that were included in section 32 of Senate Bill No. 1103 (2003–2004 Reg. Sess.). However, Assembly Bill No. 2117 died after the Senate adopted the amended version of Senate Bill No. 1103.

On November 11, 2005, after the 2004–2005 state fiscal year had ended and more than 15 months after Senate Bill No. 1103 (2003–2004 Reg. Sess.) became law, the Department published in the California Regulatory Notice Register a notice describing the methodology the Department would use to apply the rate freeze provisions of Stats. section 32. Entitled a "notice of general public interest," this notice explained that Stats. section 32 modified the PIRL calculation's "allowable costs" component by limiting a noncontract hospital's allowable costs for inpatient services provided in the state's fiscal year 2004–2005 to the hospital's costs for its fiscal period ending in calendar year 2003. (Cal. Reg. Notice Register 2005, No. 45-Z, p. 1592.) It noted there would be no public hearing on the matter, but it stated written comments "on the impact of section 32" could be submitted to the Department no later than December 31, 2005. (*Id.* at p. 1593.)[9] Counsel for plaintiffs submitted the only comment letter received by the Department.

In November 2005 when the Department issued its belated notice, the Department had not yet completed any audits of hospitals for any fiscal period containing a portion of state fiscal year 2004–2005. The Department first applied the rate freeze to a hospital's final 2004–2005 reimbursement in April 2006.

B. *Analysis*

Plaintiffs claim the Department violated a mandatory duty imposed by section (13)(A) to provide notice and an opportunity for review and comment on Stats. section 32's rate freeze before the freeze became effective. They claim section (13)(A) applies to the Legislature's actions by the statute's plain language. The federal statute requires the state plan to provide for a public process for determining rates before the rates and their methodologies become effective. Plaintiffs argue the states are subject to federal Medicaid law, and section (13)(A) contains no exception for rates and methodologies adopted by the Legislature.

The Department disagrees with this argument, asserting that section (13)(A) does not apply to legislatively mandated rate changes. It claims section (13)(A) applies only to rates established by an administrative body. The Department concurs with the trial court's reasoning: "Notice and comment procedures such as that set forth in Section 13(A) are a central feature of administrative law and procedure, applicable when a state administrative agency takes action to set rates. Such procedures *do not appear to be*

---

[9] The Department published this notice after completing its own analysis of Stats. section 32's rate freeze provisions. It was in this analysis, also compiled many months after Stats. section 32 became law, that the Department concluded for itself the rate freeze did not violate the substantive requirements of section (30)(A).

*applicable*, on the other hand, when the state administrative agency takes no discretionary action to set the rates itself, but is mandated to apply rates that have been set by the legislature." (Italics added.)

We conclude the principle vaguely espoused by the trial court does not apply in this instance.

■ We acknowledge that the Assembly and the Senate have power to adopt their own rules of proceeding, including rules for hearings and notice, and that these rules of proceeding "are the exclusive prerogative" of each house. (*People's Advocate, Inc. v. Superior Court* (1986) 181 Cal.App.3d 316, 325 [226 Cal.Rptr. 640] (*People's Advocate*); see Cal. Const., art. IV, § 7, subd. (a).) Each house "has power to adopt any procedure and to change it at any time and without notice." (*French v. Senate* (1905) 146 Cal. 604, 608 [80 P. 1031], as quoted in *People's Advocate, supra,* 181 Cal.App.3d at p. 327.)

■ "A legislative assembly, when established, becomes vested with all the powers and privileges which are necessary and incidental to a free and unobstructed exercise of its appropriate functions. These powers and privileges are derived not from the Constitution; on the contrary, they arise from the very creation of a legislative body, and are founded upon the principle of self-preservation. The Constitution is not a grant, but a restriction upon the power of the Legislature, and hence an express enumeration of legislative powers and privileges in the Constitution cannot be considered as the exclusion of others not named unless accompanied by negative terms. A legislative assembly has, therefore, all the powers and privileges which are necessary to enable it to exercise in all respects, in a free, intelligent, and impartial manner, its appropriate functions, except so far as it may be restrained by the express provisions of the Constitution [such as the supremacy clause], or by some express law made unto itself, regulating and limiting the same." (*Ex parte D. O. McCarthy* (1866) 29 Cal. 395, 403.) These powers include the power of a house of the Legislature to "establish its own rules of proceeding," and "[t]o be secret in its proceedings and debates." (*Id.* at pp. 403–404.) These powers have also been made an express part of the California Constitution. (*People's Advocate, supra,* 181 Cal.App.3d at p. 323.)

Moreover, the due process principles of notice and opportunity for hearing do not apply to legislative action. "[O]nly those governmental decisions which are *adjudicative* in nature are subject to procedural due process principles." (*Horn v. County of Ventura* (1979) 24 Cal.3d 605, 612 [156 Cal.Rptr. 718, 596 P.2d 1134], original italics.)

The case before us, however, does not concern the Legislature's power to adopt or waive its own rules when it considers new state law, nor does it involve the application of due process principles as a matter of state constitutional law to legislative action. Rather, this case concerns the extent to which a federal statute constrains state legislative action—more particularly, a federal statute's imposition of notice and comment procedures to acts by a state legislature when the state voluntarily agrees to participate in the federal program. This is a matter of federalism, not administrative law.

 Congress enacted the Medicaid Act pursuant to its powers under the federal Constitution's spending clause. (U.S. Const., art. I, § 8, cl. 1; *Independent Living Center v. Shewry, supra*, 543 F.3d at p. 1052.) The law is emboldened under the Constitution's supremacy clause (U.S. Const., art. VI, cl. 2), and preempts any state law that stands as an obstacle to its enforcement. (See *Independent Living Center v. Shewry* (S.D.Cal. Aug. 18, 2008, No. CV 08-3315) 2008 U.S.Dist. Lexis 77525 [pursuant to the supremacy clause, court enjoined enforcement of legislative reduction in Medi-Cal reimbursement rates due to Legislature's and Department's failure to comply with § (30)(A) prior to enactment of reductions].)

" 'The Medicaid program . . . is a cooperative endeavor in which the Federal Government provides financial assistance to participating States to aid them in furnishing health care to needy persons. Under this system of "cooperative federalism," [citation] if a State agrees to establish a Medicaid plan . . . the Federal Government agrees to pay a specified percentage of "the total amount expended . . . as medical assistance under the State plan. . . ." ' (*Harris v. McRae, supra*, 448 U.S. at p. 308.) Participation is voluntary, but 'once a State elects to participate, it must comply with the requirements of Title XIX.' (*Id.* at p. 301.)" (*Olszewski, supra*, 30 Cal.4th at p. 809.)

Because of the extraordinary complexity of the Medicaid statutes, Congress has also conferred on the Secretary " 'exceptionally broad authority to prescribe standards for applying certain sections of the Act.' (*Schweiker*[ *v. Gray Panthers* (1981) 453 U.S. 34,] 43 [69 L.Ed.2d 460, 469–470, 101 S.Ct. 2633]; see, e.g., 42 U.S.C. § 1396a(a)(4)(A) ['[a] State plan for medical assistance must . . . [¶] . . . [¶] . . . provide . . . such methods of administration . . . as are found by the Secretary to be necessary for the proper and efficient operation of the plan'].) Regulations promulgated by the Secretary are therefore 'entitled to "legislative effect" ' unless they exceed his or her statutory authority or are arbitrary or capricious. (*Schweiker*, at p. 44.) 'State Medicaid plans must [therefore] comply with requirements imposed both by the [Medicaid] Act itself and by the Secretary' (*id.* at p. 37), and must 'be approved by the Secretary' (*Elizabeth Blackwell Health Center v. Knoll* (3d Cir. 1995) 61 F.3d 170, 172 (*Elizabeth Blackwell Center*)).

"Despite these requirements, '[t]he [Medicaid] program was designed to provide the states with a degree of flexibility in designing plans that meet their individual needs. [Citation.] As such, states are given considerable latitude in formulating the terms of their own medical assistance plans.' (*Addis v. Whitburn* (7th Cir. 1998) 153 F.3d 836, 840.) 'Congress intended that states be allowed flexibility in developing procedures for administering their statutory obligations under the Medicaid statute and their state plans.' (*Elizabeth Blackwell Center, supra,* 61 F.3d at p. 178.)" (*Olszewski, supra,* 30 Cal.4th at p. 810, fn. omitted.)

In short, by agreeing to participate in the Medicaid program, the state subjected itself under the supremacy clause to comply with all federal Medicaid laws. Under those laws, the state would retain flexibility and discretion as allowed by those laws to develop methods and procedures, but those methods and procedures would have to satisfy the requirements of the federal law.

Plaintiffs and the Department acknowledge there are as yet no published judicial opinions addressing the application of post-Boren-Amendment section (13)(A) to legislative actions or administrative actions mandated by a state legislature. We thus review the federal Boren Amendment cases interpreting part 447.205, as they are instructive on the issue we face. These courts adhered to the concept of "cooperative federalism" when interpreting notice requirements imposed on a state under the Boren Amendment and its implementing procedural regulation, part 447.205.

In general, the few federal courts that applied part 447.205 to legislatively mandated rate changes held that the notice requirements imposed under part 447.205 applied to legislatively mandated changes. However, these courts created a partial exception to most of part 447.205's requirements by deeming the legislative process sufficient to satisfy the notice requirement if the legislative act gave little discretion to the implementing agency, *and if actual public notice was given before the measure became effective. (Claus v. Smith* (N.D.Ind. 1981) 519 F.Supp. 829 (*Claus*); *California Ass'n of Bioanalysts v. Rank* (C.D.Cal. 1983) 577 F.Supp. 1342 (*Rank*); *Wisconsin Hosp. Ass'n v. Reivitz* (7th Cir. 1987) 820 F.2d 863 (*Reivitz*); *State of Ill. v. Shalala* (7th Cir. 1993) 4 F.3d 514.)

In other words, the federal courts determined the state legislative process satisfied part 447.205(a)'s requirement of public notice of proposed changes and part 447.205(c)'s requirement that the notice explain in detail the proposed change and provide information where comments could be received. However, the state agency remained obligated to publish the notice in a state register or major newspaper prior to the change taking effect, as

required by part 447.205(d), even when the legislative action vested little discretion in the implementing agency. The action was not effective until notice was given. We turn to those cases.

*Claus, supra*, 519 F.Supp. 829, appears to be the first case creating the partial exception to part 447.205 for legislative action. The state passed a law requiring patients to provide copayments for certain nonmandated services, and it directed the state Medicaid agency to implement the law. The agency amended its rules without complying with part 447.205. The district court held the agency was required to comply with all of part 447.205's notice requirements because the legislative measure vested discretion in the agency. As part of its holding, the district court developed the partial exception to part 447.205 for legislatively mandated actions. The court held that "[w]here interpretation and discretion are required by a state statute affecting Medicaid payments, the full force of [part 447.205] applies. Were no interpretation or discretion required of [the state agency] by a given state statute, [the agency] could satisfy its procedural duties by complying with the notice publication requirement, of 42 C.F.R. § 447.205(d) . . . ." (*Claus, supra*, at p. 833.) The court cited to no authority in rendering this exception.

That same year, however, the Secretary revised part 447.205 and, in doing so, acknowledged that legislative measures underwent a public process. Nonetheless, the Secretary still required changes directly resulting from legislative action to satisfy the notice requirements of part 447.205.

Prior to 1981, part 447.205 required the state agency to give notice of any proposed change in reimbursement rates at least 60 days before the change became effective. (46 Fed.Reg. 58677 (Dec. 3, 1981).) Many states complained about the notice requirement in part because it made no provision for legislatively mandated reimbursement changes that had to be implemented immediately.

In response, the Secretary amended part 447.205 by deleting the 60-day requirement. In its place, the revised regulation required notice of a rate change to be given at some time before the change became effective. The Secretary found this change to meet both the states' interest in flexibility and providers' interest in notice. The Secretary wrote: "[A] set two-month waiting period for all reimbursement changes is too inflexible. It does not allow States to respond timely to legislatively mandated changes. Changes that are a direct result of legislative action have already gone through a public process and should not need a further prolonged notice period before finalization. We believe that specifying that a public notice must appear before the effective date of the proposed changes, without prescribing a definite comment period, is an adequate Federal requirement." (46 Fed.Reg. 58677 (Dec. 3, 1981).)

Relying on the Secretary's language, the district court in *Rank, supra,* 577 F.Supp. 1342, adopted *Claus'*s formulation of the partial exception to part 447.205's notice requirements for legislatively mandated action. There, the California Legislature adopted a statute effective July 1, 1982, that required the Department to reduce reimbursement rates for laboratory and pathology services by an average of 25 percent. On July 30, 1982, the Department issued emergency regulations implementing the statute that were effective immediately. It gave two types of notice. In late July 1982, it published a bulletin prior to the regulations' effective date and forwarded it to affected providers. On August 11, 1982, it also published a notice of the emergency regulations in the state register. This notice stated the regulations' effective date was August 1, 1982. The plaintiffs claimed the Department failed to comply with the detailed notice requirements of part 447.205. (*Rank, supra,* at pp. 1345–1346.)

The district court agreed the notice did not comply with the requirements of part 447.205, but it excused compliance because the plaintiffs had received actual notice and were not prejudiced by any of the inadequacies. Of relevance here, the court noted that the judicially created partial exception to the full notice requirements of part 447.205 existed for certain legislatively mandated actions. The exception was based on the rationale that changes mandated by the Legislature " 'have already gone through a public process,' " and as a result, the objectives of the notice requirements—to secure public comment and promote accountability among decision makers—had already been met. (*Rank, supra,* 577 F.Supp. at p. 1348.) Thus, where the statute imposed only ministerial duties on an agency, part 447.205 required only publication of the proposed change before its effective date. (*Rank, supra,* at p. 1348; pt. 447.205(d).)

The district court then noted that in the case before it, the Legislature had extended wide discretion to the Department regarding implementation of the rate cut. Thus, the Department was obligated to comply with all of the notice requirements contained in part 447.205, something the Department failed to do. Nonetheless, the district court refused to enjoin the regulations because the plaintiffs had received actual notice of the regulations before they went into effect. (*Rank, supra,* 577 F.Supp. at pp. 1349–1350.)

The next cases to broach the issue confirmed that part 447.205's notice requirements applied to agency actions mandated by state legislatures. In *Reivitz, supra,* 820 F.2d 863, urged on us here by plaintiffs, the state legislature adopted a statute on April 30, 1982, that postponed for three months any rate increase scheduled to take effect between July 1, 1982, and June 30, 1983. As in the case before us, the legislature passed the statute without any effort by the state to comply with the notice provisions of part

447.205 and without amending the state plan to reflect a material change in state law. (*Reivitz, supra,* at p. 865.)

The federal court of appeals determined the state violated Medicaid's notice regulations, and it affirmed the federal trial court's declaration and injunction to that effect. The state statute created a significant change in the state's Medicaid plan, and thus triggered the notice requirement of part 447.205. The state violated that regulation when it let the statute go into effect without providing notice or amending the state plan. (*Reivitz, supra,* 820 F.2d at p. 869.)

Another Seventh Circuit case, which none of the parties has cited, reached a similar result. *State of Ill. v. Shalala, supra,* 4 F.3d 514, concerned legislatively mandated amendments to Illinois's state plan. On June 30, 1989, the last day of the legislative session, the legislature adopted two statutes increasing Medicaid reimbursement rates effective the following day, July 1, 1989. Notice of the new laws did not appear in the state register until August 18 and September 1, 1989. The federal Secretary approved the plan amendments mandated by the new statutes, but concluded they could not be effective until the day after they were published in the state register. This precluded Illinois from seeking federal assistance for the increased reimbursement obligations it incurred between July 1 and the amendments' effective dates. (*Id.* at p. 515.)

Illinois argued its plan amendments were exempt from part 447.205's notice requirements because they were mandated by state legislation. (*State of Ill. v. Shalala, supra,* 4 F.3d at p. 516.) It noted the legislative process on the bills, unlike that for Senate Bill No. 1103 (2003–2004 Reg. Sess.), was highly visible, the interested parties were closely involved, and the contents and progress of both bills were widely published prior to enactment in various legislative journals. (4 F.3d at p. 515.) The court of appeals nonetheless concluded part 447.205 applied.

After reviewing the history behind part 447.205, the court concluded there was "little doubt" that "the regulations contemplate their application to Medicaid amendments specifically mandated by legislation." (*State of Ill. v. Shalala, supra,* 4 F.3d at p. 517.) Citing *Rank,* the court recognized the partial exception to part 447.205 for legislatively mandated agency actions that vested no discretion in the state's Medicaid agency. However, the exception did not exempt legislative actions entirely. Compliance with subsection (d) of part 447.205, by publishing notice before the measure's effective date, was still required. (*State of Ill. v. Shalala, supra,* 4 F.3d at p. 517.) The court affirmed the Secretary's refusal to give the amendments retroactive effect due to the state's failure to give prior notice. (*Id.* at p. 518.)

Each of these cases confirms that Medicaid's notice requirements imposed under the Boren Amendment and part 447.205 applied to measures adopted or mandated by state legislatures. If a state agreed to participate in the Medicaid program, it had to comply with the program's notice requirements. Implicitly recognizing the program's cooperative federalism, however, the courts deemed that a state's legislative process· fulfilled the notice requirements so long as notice was published before the measure became effective.

■ Turning to our case, we have no doubt that the principle of cooperative federalism contained in part 447.205 as just discussed continues in current section (13)(A). Nothing in the language of section (13)(A) indicates Congress intended to abrogate the holdings of the cases just discussed and excuse a state from providing any notice of legislatively revised reimbursement rates. A state can develop whatever type of public process it chooses, including a legislative process for establishing and revising reimbursement rates. However, Congress clearly imposed a duty on a state participating in Medicaid to ensure that whatever process it develops and uses at a minimum satisfies the publication and comment requirements of section (13)(A). The supremacy clause superimposes that duty over any conflicting procedure the state may utilize.

The trial court and plaintiffs rely on one other Boren Amendment case, *Minnesota Homecare Ass'n, Inc. v. Gomez* (8th Cir. 1997) 108 F.3d 917 (*Minnesota Homecare*), and *Rank* to claim the notice requirements of section (13)(A) do not apply to legislative action. They misread the holdings of those cases. In *Minnesota Homecare*, the plaintiffs claimed the Minnesota legislature violated the substantive "equal access" requirements of section (30)(A) by adopting reimbursement rates without conducting any formal analysis of the factors listed in section (30)(A). The court disagreed. Although the Medicaid Act requires states to consider certain factors when setting rates, "it does not require the State to utilize any prescribed method of analyzing and considering said factors." (*Minnesota Homecare, supra*, at p. 918.) In that instance, the record demonstrated that the plaintiffs and others had in fact raised the required factors to the legislature as part of its consideration of the proposed rates. This was sufficient to find the state's methodology satisfied the requirements of section (30)(A).

One of the judges concurred separately, concluding the plaintiffs had not stated a claim because the legislature had set the rates in question. "Federal courts do not undertake administrative law review of legislative action, certainly not the action of a state legislature. Review of statutory rates must be limited to whether their result in the marketplace is consistent with the substantive requirements of federal law." (*Minnesota Homecare, supra*, 108 F.3d at p. 919 (conc. opn. of Loken, J.).) The trial court here relied upon this statement as the basis of its decision under section (13)(A).

The concurring judge's statement is not persuasive. First, as already stated, we are not asked in this case to conduct administrative law review of legislative action. Rather, we are asked to interpret federal statutes and regulations to determine whether they impose notice requirements on actions taken or mandated by a state legislature participating in the Medicaid program. If they do, the fact that notice requirements are usually associated with administrative action is irrelevant.

Second, the concurring judge's assertion goes far beyond the court's *per curiam* opinion that the state had in fact complied with the procedural requirements section (30)(A) imposed on it. Significantly, Minnesota had complied with those requirements at the legislative level. Nothing in the court's opinion suggests the legislature was free to ignore the requirements of the Medicaid Act and its regulations. *Minnesota Homecare* offers the Department no assistance.

We also disagree with the Department's and trial court's reliance on *Rank*. Contrary to the Department's arguments, the federal district court in *Rank* did not hold that no notice was required for legislatively mandated rate reductions. It stated that even when the legislative mandate vests only ministerial authority in the Department, the Department still must give notice under part 447.205(d) before the action goes into effect. At best, the *Rank* court simply held that where a state provides inadequate formal notice, an aggrieved provider with actual notice lacks standing to complain of notice defects. (*State v. Shalala* (10th Cir. 1994) 42 F.3d 595, 603, fn. 13; *State of Ill. v. Shalala, supra*, 4 F.3d at p. 517.)

■ Having concluded section (13)(A) applies to legislatively mandated or adopted rate revisions, we now turn to review the record and determine whether the public process utilized for Stats. section 32 satisfied section (13)(A)'s publication and comment requirements.[10] To review, section (13)(A) requires the state to publish the proposed reimbursement rates for inpatient services, the methodologies underlying the establishment of the proposed rates, and the justifications for the proposed rates. (§ (13)(A)(i).) The state must then provide providers such as plaintiffs "a reasonable opportunity for review and comment on the proposed rates, methodologies, and justifications." (§ (13)(A)(ii).) The state must also publish the final rates, their underlying methodologies, and their justifications. (§ (13)(A)(iii).)

---

[10] The Department asks us to remand the matter to the trial court to determine the adequacy of its compliance with section (13)(A). The Department and plaintiffs, however, submitted evidence concerning the adequacy of the notice and fully argued the matter to the trial court. Those facts are not in dispute and we may treat the matter as an issue of law. A new trial thus would be a waste of effort. We may proceed to judgment under these circumstances. (See *Mid-Century Ins. Co. v. Gardner* (1992) 9 Cal.App.4th 1205, 1220 [11 Cal.Rptr.2d 918].)

■ As the *Rank* court noted, the legislative process is a public process that usually satisfies the objectives of the notice requirements: securing public comment and promoting accountability among decision makers. (*Rank, supra,* 577 F.Supp. at p. 1348.) Under the usual process in California, for example, after a nonbudget bill is introduced, it cannot be heard or acted upon by a committee or either house for a period of 30 days, thereby giving the interested public time to review the proposal. (Cal. Const., art. IV, § 8, subd. (a).)

Indeed, the Assembly has a rule regarding budget spot bills that fulfills the same purpose. The Assembly's standing rules for the 2003–2004 session prohibited the Assembly from voting on the spot bill, as amended to include the budget provisions, until the bill had been in print for at least 15 days. (Assem. Res. No. 1 (2003–2004 Reg. Sess.) § 51.5.) Under these usual circumstances, a legislative process could provide notice and an opportunity for review and comment, but that did not happen here.

■ Unfortunately for the Department, the truncated process utilized with Senate Bill No. 1103 (2003–2004 Reg. Sess.) did not satisfy the object and purpose of section (13)(A), even when we assume a limited exemption for legislative action exists. Stats. section 32 of Senate Bill No. 1103 (2003–2004 Reg. Sess.) appeared on July 27, was adopted by the full Assembly on July 28, and was adopted by the full Senate on July 29. Even the Department did not know of Stats. section 32 until it was enacted. The record does not support an inference, much less establish, that the proposed Stats. section 32 was made public in such a way that providers such as plaintiffs were given a reasonable opportunity to review and comment on the proposal. There is no evidence in the record that plaintiffs had actual notice of the proposed Stats. section 32. The only notice plaintiffs received concerning Stats. section 32's rate freeze arrived several months later, after the state's fiscal year to which Stats. section 32 applied had already ended and they had provided the services to which Stats. section 32 applied. This legislative process did not fulfill the purposes of section (13)(A).

Because we conclude the trial court erred in its ruling under section (13)(A), we need not reach the parties' remaining arguments, the Department's appeal, or the parties' requests for judicial notice. We note, however, that our reasoning on the application of section (13)(A) would also require the application of section (30)(A) to the adoption of Stats. section 32. (*Independent Living Center, supra,* 2008 U.S.Dist. Lexis 77525.)

## DISPOSITION

The judgment is reversed and the matter is remanded to the trial court. The trial court shall issue a writ of mandate enjoining the Department from utilizing Stats. section 32 in its calculations of plaintiffs' reimbursement rates for the state fiscal year 2004–2005.

Costs on appeal are awarded to plaintiffs. (Cal. Rules of Court, rule 8.278(a).)

Sims, Acting P. J., and Cantil-Sakauye, J., concurred.

The petition of appellant Sandra Shewry for review by the Supreme Court was denied February 11, 2009, S169393. Werdegar, J., did not participate therein.