Filed 5/1/23

CERTIFIED FOR PUBLICATION


IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

THIRD APPELLATE DISTRICT

(Sacramento)

----


| | |
|---|---|
| CRESTWOOD BEHAVIORAL HEALTH, INC., <br><br> Plaintiff and Appellant, <br><br> v. <br><br> MICHELLE BAASS, as Director, etc., et al., <br><br> Defendants and Respondents. | C094882 <br><br> (Super. Ct. No. 34201980003129CUWMGDS) |
| ROYALE HEALTH CARE CENTER, INC., <br><br> Plaintiff and Appellant, <br><br> v. <br><br> MICHELLE BAASS, as Director, etc., et al., <br><br> Defendants and Respondents. | C095532 <br><br> (Super. Ct. No. 34201980003351CUWMGDS) |
| WEST ANAHEIM EXTENDED CARE et al., <br><br> Plaintiffs and Appellants, <br><br> v. <br><br> MICHELLE BAASS, as Director, etc., et al., <br><br> Defendants and Respondents. | C095533 <br><br> (Super. Ct. No. 34201980003238CUWMGDS) |


1

APPEALS from judgments of the Superior Court of Sacramento County, Laurie M. Earl, Judge. Affirmed.

Hooper, Lundy & Bookman, Stanton J. Stock, Alicia W. Macklin, Sansan Lin, Jeffrey Lin and Mark E. Regan for Plaintiffs and Appellants.

Rob Bonta, Attorney General, Cheryl L. Feiner, Senior Assistant Attorney General, Gregory D. Brown and Christine M. Murphy, Deputy Attorneys General, for Defendants and Respondents.

Appellants Crestwood Behavior Health, Inc. (Crestwood), West Anaheim Extended Care and Extended Care Hospital of Westminster (West Anaheim), and Royale Health Care Center dba South Coast Post Acute (South Coast) (together, appellants) operate skilled nursing facilities serving beneficiaries of the California Medical Assistance Program (Medi-Cal). Respondent Department of Health Care Services (the Department) administers Medi-Cal. (*Santa Rosa Memorial Hospital, Inc. v. Kent* (2018) 25 Cal.App.5th 811, 815-816; Welf. & Inst. Code, §§ 14000-14198.2; Cal. Code Regs., tit. 22, § 50004.)[1] As relevant here, the Department also administers the "Skilled Nursing Facility Quality and Accountability Supplemental Payment System" (QASP), which authorizes supplemental payments, over and above Medi-Cal reimbursement rates, to skilled nursing facilities meeting certain performance standards. (§ 14126.022.)

These consolidated appeals challenge the Department's method for calculating QASP payments. Appellants argue they have not received all the QASP payments to which they are entitled and blame the alleged underpayment to the Department's practice of excluding certain Medi-Cal days—known as "special treatment program days" or "STP days"—from its calculations. They seek writs of mandate directing the Department to include STP days in the calculation of QASP payments.

_____

[1] Undesignated statutory references are to the Welfare and Institutions Code.

We conclude, as did the trial court, that appellants have failed to identify an appropriate basis for writ relief. Section 14170, subdivision (a)(1), on which they currently rely, does not impose a mandatory or ministerial duty on the Department that could support the issuance of a writ of mandate. And appellants have not shown any abuse of discretion by the Department. Accordingly, we will affirm the judgments.

## I. BACKGROUND

### A.    Statutory and Regulatory Framework

Medicaid is a cooperative federal-state program under which the federal government and participating state governments share the costs of providing health care services to qualified low-income persons. (*County of Colusa v. Douglas* (2014) 227 Cal.App.4th 1123, 1126; 42 U.S.C. § 1396 et seq.) "States are not required to participate in Medicaid, but all of them do." (*Arkansas Dept. of Health and Human Servs. v. Ahlborn* (2006) 547 U.S. 268, 275.)

"Medicaid is jointly financed by the federal and state governments and is administered by state governments through state 'plans,' which are approved by the federal Secretary of Health and Human Services." (*B.K. ex rel. Tinsley v. Snyder* (9th Cir. 2019) 922 F.3d 957, 963; see also 42 U.S.C. § 1396a(b); *California Hospital Assn. v. Maxwell-Jolly* (2010) 188 Cal.App.4th 559, 564 ["Although state participation is voluntary, if a state chooses to participate, it must prepare and submit a plan for approval to the federal government, describing its Medicaid program"].) State plans must establish payment rates for the various services provided under the plan. (42 U.S.C. § 1396a(a)(30); *California Assn. for Health Services at Home v. State Dept. of Health Services* (2007) 148 Cal.App.4th 696, 701 ["The Medicaid Act requires each participating state to adopt a state plan describing the policy and methods to be used to set payment rates"].) Compliance with the state plan is mandatory. (42 U.S.C. § 1396a(a)(1); *Mission Hospital Regional Medical Center v. Shewry* (2008) 168 Cal.App.4th 460, 470 ["The state plan is mandatory"].)

3

California participates in the federal Medicaid program through Medi-Cal. (§ 14000 et seq.; *County of Colusa v. Douglas, supra,* 227 Cal.App.4th at p. 1126; *Olszewski v. Scripps Health* (2003) 30 Cal.4th 798, 804.) The Department administers Medi-Cal in accordance with California's state plan (State Plan), which specifies the methods and standards used to set reimbursement rates for services provided to Medi-Cal beneficiaries. (Cal. Code Regs., tit. 22, § 50004; *California Assn. for Health Services at Home v. State Dept. of Health Services, supra,* 148 Cal.App.4th at pp. 700-701; see also 42 C.F.R. § 447.252(b).)

1.     *Skilled Nursing Facilities and Special Treatment Program Services*

Skilled nursing facilities provide 24-hour skilled nursing and supportive care to patients who require such care on an extended basis. (Health & Saf. Code, § 1250, subd. (c)(1).) Skilled nursing facilities may also operate "optional service units," which provide specific types of patient care. (Cal. Code Regs., tit. 22, § 72401, subd. (a).) Optional service units may provide physical therapy, occupational therapy, speech therapy, speech pathology, audiology, social work services, or special treatment program (STP) services. (Cal. Code Regs., tit. 22, § 72401, subd. (b).) We are concerned here with the last of these, STP services.

STP services are provided to patients who have chronic psychiatric impairments and whose adaptive functioning is moderately impaired. (Cal. Code Regs., tit. 22, § 72443, subd. (a).) "Special treatment program services are those therapeutic services, including prevocational preparation and prerelease planning, provided to mentally disordered persons having special needs in one or more of the following general areas: self-help skills, behavior adjustment, interpersonal relationships." (*Ibid.*) Appellants provide STP services at their skilled nursing facilities.

Skilled nursing facilities are licensed by the Department for specific numbers and types of beds. For example, Crestwood Manor Modesto is licensed for 194 beds, 118 of which are ordinary skilled nursing facility beds (SNF beds), and 76 of which are STP

4

beds. SNF beds and STP beds are not interchangeable. They are located in physically separate and distinct parts of the skilled nursing facility, and patients are assigned to one or the other, depending on their condition. Despite these distinctions, patients assigned to STP beds receive the same baseline set of services as patients assigned to SNF beds. (Cal. Code Regs., tit. 22, § 72301, subds. (a)-(b).) Thus, patients assigned to STP beds receive *both* skilled nursing facility services *and* STP services.[2] (*Ibid.*)

2. *Reimbursement Rates and Rate Setting Audits*

" 'The Medi-Cal program does not directly provide services; instead, it reimburses participating health care plans and providers for covered services provided to Medi-Cal beneficiaries.' " (*Dignity Health v. Local Initiative Health Care Authority of Los Angeles County* (2020) 44 Cal.App.5th 144, 152.) Prior to 2004, providers received a fixed amount per patient per day that provided "no incentive for quality care while reimbursing [them] about $5[,]000 a year less than it costs to care for these residents." (Assem. Floor Analysis of Assem. Bill No. 1629 (2003-2004 Reg. Sess.) as amended Aug. 24, 2004, p. 6.) The Legislature adopted the Medi-Cal Long-Term Care Reimbursement Act (Reimbursement Act) in September 2004. (See §§ 14126-14126.035.) The purpose of the Reimbursement Act was to devise a Medi-Cal reimbursement methodology that "more effectively ensures individual access to appropriate long-term care services, promotes quality resident care, advances decent wages and benefits for nursing home workers, supports provider compliance with all applicable state and federal requirements, and encourages administrative efficiency." (§ 14126.02, subd. (a).)

The Reimbursement Act requires the Department to calculate reimbursement rates for facilities participating in the Medi-Cal program based on their actual costs of providing health care services to Medi-Cal beneficiaries. (§ 14126.02, subd (b) [directing

---

[2] As we shall discuss, skilled nursing facilities that provide STP services receive an additional reimbursement amount known as the "STP patch."

5

the Department to "implement a facility-specific rate[ ]setting system . . . that reflects the costs and staffing levels associated with quality of care for residents in nursing facilities"].)  Skilled nursing facilities report their costs to the Department in annual cost reports, which include information concerning the number of days of care that have been provided to Medi-Cal beneficiaries (sometimes called "patient days" or "bed days"), and the payor type for days of care provided (e.g., Medi-Cal, Medicare, private payor).  (§ 14126.023, subds. (i) and (j).)  Reimbursement rates are set using information contained in annual cost reports, and expressed as the amount received by each facility per patient per day.  (§ 14126.023, subds. (i) and (j).)  For example, a facility with a reimbursement rate of $100 would receive $100 for each day of care provided to a Medi-Cal beneficiary.[3]

The Department audits annual cost reports as part of the rate setting process. During an audit, the Department may review invoices and insurance plans to verify reported expenses, or request patient census data to verify numbers of patient days.  The results of the audit are summarized in auditor's work papers and shared with the audited facility, which may propose adjustments or provide additional information, as appropriate.  The Department then issues a final audit report.  The Department's final audit report reflects the facility's total patient days, fee-for-service days, and managed care days.[4]  The final audit report may also reflect STP days; however, STP days are not audited.  This point will become important later.

---

[3] Crestwood's reimbursement rates during the relevant period ranged from $187 to $272 per day.

[4] Medi-Cal reimburses participating health care plans and providers "using two systems: fee-for service and managed care.  [Citations.] [¶] Medi-Cal beneficiaries in the fee-for-service system may obtain services 'from any provider that participates in Medi-Cal, is willing to treat the beneficiary, and is willing to accept reimbursement from [the Department] at a set amount for the services provided.' " (*Dignity Health v. Local*

6

Skilled nursing facilities offering STP services receive an additional reimbursement amount of $5.72 per patient day, known as the "STP patch." (Cal. Code Regs., tit. 22, § 51511.1.) Thus, returning to our earlier example, a skilled nursing facility with a reimbursement rate of $100 would receive $105.72 for each day the facility provided STP services to a Medi-Cal beneficiary. The State Plan describes the STP patch as "[a] flat add-on rate determined to be the additional cost for facilities to perform [STP] services." The State Plan also clarifies that STP services "do[] not constitute a separate level of care."

3.    *The QASP Program*

In 2010, the Legislature amended the Reimbursement Act by adding section 14126.022. (Stats. 2010, ch. 717, § 152, eff. Oct. 19, 2010.) Section 14126.022 directs the Department to develop the QASP program, subject to approval by the federal Centers for Medicare and Medicaid Services. (§ 14126.022, subd. (a)(1).) The purpose of the QASP program is to "provide supplemental payments to skilled nursing facilities that improve the quality and accountability of care rendered to residents in skilled nursing facilities . . . and to penalize those facilities that do not meet measurable standards." (§ 14126.022, subd. (a)(2)(A).)

Supplemental payments are based on performance measures that include immunization rates, facility acquired pressure ulcer incidence, the use of physical restraints, compliance with requirements regarding nursing or direct care service hours per patient day, resident and family satisfaction, and staff retention. (§ 14126.022, subd. (i)(2)(A).) Section 14126.022 does not say how QASP payments are to be calculated or

_____

*Initiative Health Care Authority of Los Angeles County, supra,* 44 Cal.App.5th at p. 152.) "In the managed care system, '[the Department] contracts with health maintenance organizations (HMOs) and other managed care plans . . . to provide health coverage to Medi-Cal beneficiaries, and the plans are paid a predetermined amount for each beneficiary per month, whether or not the beneficiary actually receives services." (*Ibid.*)

7

awarded. These matters are instead left to the Department, subject to approval by the federal government. (§ 14126.022, subd. (a).) The Department has developed procedures for administering the QASP program, which are set forth in the State Plan.

The State Plan establishes a three-tiered scoring methodology for supplemental payments under the QASP program. Skilled nursing facilities must meet certain performance criteria, placing them in either the second or third tier, to qualify for supplemental QASP payments. The Department sets a per diem rate for each tier, with the third tier per diem rate equal to 1.5 times the second tier per diem rate.[5] A skilled nursing facility's supplemental payment under the QASP program is calculated by multiplying the applicable per diem rate by the "number of Medi-Cal bed days (including Fee-For-Service and managed care days) for the audit period." Thus, skilled nursing facilities with a higher number of bed days receive higher QASP payments.

Here is where things get interesting. The State Plan provides: "The Department will utilize audited Medi-Cal Fee-For-Service and managed care bed days for determining payment amounts. The audited bed days are drawn from the audit reports used to establish . . . Fee-For-Service per diem rates." As mentioned above, the audit reports used to establish reimbursement rates reflect the number of STP bed days reported by each skilled nursing facility, but those days are not audited. Because they are not audited, STP days are not included in the calculation of supplemental payments under the QASP program. As a result, appellants say, they have missed out on millions of dollars in QASP payments to which they would otherwise be entitled.

B.     *Petitions for Writ of Mandate*

Appellants filed separate, though substantially similar, petitions for writ of mandate against the Department and three former directors of the Department, Jennifer

---

[5] Appellants' skilled nursing facilities appear to have been assigned to the second and third tiers during the relevant periods.

Kent, Richard Figueroa, Jr., and Bradley P. Gilbert. The petitions allege the Department should have included STP days in calculating appellants' QASP payments, and the failure to do so undermines the legislative goal of incentivizing skilled nursing facilities to offer high quality care to Medi-Cal beneficiaries. What's more, the petitions say, the practice of excluding STP days from QASP calculations disincentivizes skilled nursing facilities from offering STP services at all. The petitions seek writs of mandate ordering the Department to include STP days in the calculation and award of QASP payments. The petitions do not challenge the State Plan.

The Department answered the first filed petition in the Crestwood action (Sacramento Superior Court case No. 34-2019-800003129CUWMGDS) and demurred to the petitions in the West Anaheim and South Coast actions (Sacramento Superior Court case Nos. 34-2019-800003238CUWMGDS and 34-2020-800003351CUWMGDS, respectively). The trial court ordered the cases related pursuant to California Rules of Court, rule 3.300, and exercised discretion to postpone the hearing on the demurrers in the West Anaheim and South Coast actions until after the hearing on the merits in the Crestwood action.

The hearing on the merits in the Crestwood action took place in April 2021. The trial court took the matter under submission and ultimately entered an order denying the petition. The trial court entered judgment in the Department's favor in June 2021.

With the Crestwood action resolved, the trial court next turned to the petitions in the West Anaheim and South Coast actions. The trial court received and considered supplemental briefing, and then sustained the demurrers to both petitions without leave to amend. The trial court entered judgment in the Department's favor in the West Anaheim and South Coast actions in October and December 2021, respectively.

These appeals timely followed.

## II. DISCUSSION

A.    *Standards of Review*

9

We are tasked here with reviewing two types of orders. First, we must review the order denying the petition for writ of mandate in the Crestwood action. Because appellants' arguments are almost entirely geared to the Crestwood action, we will focus our discussion there as well. Second, we must review the orders sustaining the demurrers to the petitions in the West Anaheim and South Coast actions. These orders receive scant attention in appellants' opening briefs, and we will likewise afford them only brief consideration. We set forth the applicable standards of review below.

1. *Writ of Mandate*

A traditional writ of mandate lies "to compel the performance of an act which the law specifically enjoins, as a duty resulting from an office, trust, or station." (Code Civ. Proc., § 1085, subd. (a); *Common Cause v. Board of Supervisors* (1989) 49 Cal.3d 432, 442 ["Mandamus will lie to compel a public official to perform an official act required by law"].) To obtain relief, the petitioner must establish the existence of a public officer's or a public entity's "clear, present, and ministerial duty where the petitioner has a beneficial right to performance of that duty." (*California Assn. of Professional Scientists v. Department of Finance* (2011) 195 Cal.App.4th 1228, 1236 (*Professional Scientists*); see *County of Los Angeles v. City of Los Angeles* (2013) 214 Cal.App.4th 643, 653.)

Writ relief may be available in two circumstances, both of which are relevant here. (*Glendale City Employees' Assn., Inc. v. City of Glendale* (1975) 15 Cal.3d 328, 344 ["mandamus may issue to compel the performance of a ministerial duty or to correct an abuse of discretion"]; *County of Los Angeles v. City of Los Angeles, supra,* 214 Cal.App.4th at p. 653 ["Code of Civil Procedure section 1085 permits judicial review of ministerial duties as well as quasi-legislative and legislative acts"].) First, "[a] court may issue a writ of mandate to compel a public agency or officer to perform a mandatory duty. [Citation.] 'This type of writ petition "seeks to enforce a mandatory and ministerial duty to act on the part of an administrative agency or its officers." ' [Citation.] ' "[T]he writ will not lie to control discretion conferred upon a public officer or agency."

10

' " (*Collins v. Thurmond* (2019) 41 Cal.App.5th 879, 914.)  Under this theory of relief, "[m]andamus may issue . . . to compel an official both to exercise his discretion (if he is required to do so) and to exercise it under a proper interpretation of the applicable law." (*Common Cause v. Board of Supervisors, supra*, 49 Cal.3d at p. 442.)  "Often, the crucial issue when the petitioner seeks such relief is whether the act that the petitioner seeks to compel is a *mandatory and ministerial* duty, or, on the contrary, is a *quasi-legislative and discretionary* act.  ' " " '[I]n most cases, the appellate court must determine whether the agency had a ministerial duty capable of direct enforcement or a quasi-legislative duty entitled to a considerable degree of deference.  This question is generally subject to de novo review on appeal because it is one of statutory interpretation, a question of law for the court.' " ' " (*CV Amalgamated LLC v. City of Chula Vista* (2022) 82 Cal.App.5th 265, 279 (*CV Amalgamated*).)

"Second, a court may issue a writ when a public agency has abused its discretion in carrying out a *discretionary* function.  'Although traditional mandamus will not lie to compel the exercise of discretion in a particular manner, it is a proper remedy to challenge agency discretionary action as an abuse of discretion.' " (*CV Amalgamated, supra,* 82 Cal.App.5th at p. 279.)  " 'When a court reviews a public entit[y's] decision for an abuse of discretion, the court may not substitute its judgment for that of the public entity, and if reasonable minds may disagree as to the wisdom of the public entity's discretionary determination, that decision must be upheld.  [Citation.]  Thus, the judicial inquiry . . . addresses whether the public entity's action was arbitrary, capricious or entirely without evidentiary support, and whether it failed to conform to procedures required by law.' " (*Id.* at p. 280.)

"With respect to both theories of writ relief, '[w]hen an appellate court reviews a trial court's judgment on a petition for a traditional writ of mandate, it applies the substantial evidence test to the trial court's findings of fact and independently reviews the trial court's conclusions on questions of law, which include the interpretation of a statute

11

and its application to undisputed facts.' " (*CV Amalgamated, supra,* 82 Cal.App.5th at p. 280.)

    2.    *Demurrer*

On appeal from a judgment based on an order sustaining a demurrer, we assume all the facts alleged in the complaint (or petition) are true. (*Pineda v. Williams-Sonoma Stores, Inc.* (2011) 51 Cal.4th 524, 528.) We accept all properly pleaded material facts, but not contentions, deductions, or conclusions of fact or law. (*Evans v. City of Berkeley* (2006) 38 Cal.4th 1, 6.) We may also consider matters subject to judicial notice. (*Ibid.*) We determine de novo whether the complaint (or petition) alleges facts sufficient to state a cause of action under any legal theory. (*Committee for Green Foothills v. Santa Clara County Bd. of Supervisors* (2010) 48 Cal.4th 32, 42.) We read the complaint (or petition) as a whole and its parts in their context to give the pleading a reasonable interpretation. (*Evans v. City of Berkeley, supra,* at p. 6.)

When a trial court has sustained a demurrer without leave to amend, "we decide whether there is a reasonable possibility that the defect can be cured by amendment: if it can be, the trial court has abused its discretion and we reverse; if not, there has been no abuse of discretion and we affirm." (*Blank v. Kirwan* (1985) 39 Cal.3d 311, 318.) "The burden of proving such reasonable possibility is squarely on the plaintiff." (*Ibid.*)

B.    *Crestwood Action*

Appellants spend most of their time on issues related to the Crestwood action. Of these, only two warrant serious discussion. First, appellants—or rather, Crestwood—suggest section 14170 imposes a mandatory and ministerial duty on the Department to include STP days in the calculation and award of QASP payments. Second, Crestwood suggests the Department abused its discretion in failing to include STP days in QASP calculations. We consider—and reject—these arguments momentarily.

Before we continue, we should note that Crestwood expends considerable energy rehashing arguments that do not demonstrate error. Indeed, Crestwood devotes two

sections of its opening brief—more than eight pages—to things the trial court supposedly got right. For example, Crestwood tells us the trial court properly rejected the Department's argument that California Code of Regulations, title 22, section 51511.1 (which authorizes the STP patch) precludes the Department from including STP days in the QASP calculation. Crestwood also says the trial court was right to reject the Department's argument that section 14126.022 exempts STP days from the QASP program. And Crestwood agrees with the trial court's conclusion that Assembly Bill No. 81 (2019-2020 Reg. Sess.) (Stats. 2020, ch. 13, § 10) (Assembly Bill 81), which states that STP services "shall continue to be exempt" from the QASP program, "is 'a factor' for the [c]ourt to consider, but is neither binding nor conclusive."[6] (See generally *McClung v. Employment Development Department* (2004) 34 Cal.4th 467, 473 [" 'a legislative declaration of an existing statute's meaning' is but a factor for a court to consider and 'is neither binding nor conclusive in construing the statute' "].) These arguments miss the mark.

That the trial court was unmoved by the Department's stated reasons for excluding STP days from the QASP program does not establish any error in denying the petition. The trial court was crystal clear that Crestwood's policy arguments about whether the Department could or should include STP days in QASP calculations were no substitute for the requirement that Crestwood identify a mandatory and ministerial duty requiring the Department to do so. As the trial court observed: "Crestwood spends most of its time attacking various arguments the Department has made about why STP days are not

_____

[6] Assembly Bill 81 became effective during the pendency of this case and added a new subsection to section 14126.022, which reads: "Notwithstanding any other law, special program services for the mentally disordered that are entitled to receive the supplemental payment under Section 51511.1 of Title 22 of the California Code of Regulations shall continue to be exempt from the Skilled Nursing Facility Quality and Accountability Supplemental Payment System." (§ 14126.022, subd. (a)(2)(C).)

included when calculating QASP payments, and very little time explaining why the law requires those days to be included. Some of Crestwood's arguments are quite convincing. None of them, however, demonstrate that the Department is required by law to include STP days when calculating QASP payments. Thus, Crestwood fails to meet its burden." So too here.

### 1. Mandatory and Ministerial Duty

Crestwood's search for a mandatory and ministerial duty begins and ends with section 14170, which requires the Department to implement an auditing system ensuring that federal and state funds are spent responsibly. (§ 14170, subd. (a)(1).) Specifically, Crestwood argues support for the existence of a mandatory and ministerial duty can be found in section 14170, subdivision (a)(1). That subdivision provides, in pertinent part, that cost reports and other data "shall be considered true and correct unless audited or reviewed within three years after the close of the period covered by the report." (*Ibid*.) Crestwood's argument, which was only belatedly articulated in the trial court, fails to identify any clear duty that could be remedied by the issuance of a writ of mandate.[7] (*Professional Scientists, supra,* 195 Cal.App.4th at p. 1236.)

Section 14170 vests the Department with discretion to decide which cost reports and cost data should be audited. (§ 14170, subd. (a)(1) ["Amounts paid for services provided to Medi-Cal beneficiaries shall be audited by the department in the manner and form prescribed by the department"].) "Section 14170 does not prescribe a particular form required for an audit. Instead, the scope of an audit is a matter left to the Department's discretion." (*Kaiser Foundation Hospitals v. Belshé* (1997) 54 Cal.App.4th

---

[7] Crestwood mentioned section 14170 in its opening brief to the trial court but made no serious attempt to argue subdivision (a)(1) imposed any mandatory and ministerial duty on the Department. That argument was not fully developed until the hearing on the petition. Nevertheless, we exercise our discretion to consider the untimely argument on the merits.

14

1547, 1558 (*Kaiser*).) As we shall discuss, the Department has exercised discretion to exclude STP days from rate setting audits.

Subdivision (a)(1) limits the Department's discretion by providing that cost reports and other data "shall be considered true and correct unless audited or reviewed within three years after the close of the period covered by the report." (§ 14170, subd. (a)(1); *Palmdale Hospital Medical Center v. Department of Health Services* (1992) 8 Cal.App.4th 1306, 1313 ["Plainly, unless one of the statutory exceptions applies, the Department cannot question the information submitted by the provider once the three-year period has expired"]; *Redding Medical Center v. Bonta* (2004) 115 Cal.App.4th 1031, 1041 [the Department "may not question the veracity of cost reports outside the prescribed review period of three years" unless an exception applies].) However, subdivision (a)(1) of section 14170 does not prescribe any "act" the Department must take with respect to unaudited or unreviewed cost reports. (*Palmdale Hospital Medical Center, supra,* at p. 1313 ["the *sole* consequence of the Department's failure to audit or review a provider's cost report or other data within three years is that such information 'shall be considered true and correct' "].) Herein lies the problem for Crestwood.

Contrary to Crestwood's suggestion, subdivision (a)(1) of section 14170 does not impose a mandatory and ministerial duty on the Department to treat unaudited cost reports and data as though they had been audited. To say that unaudited cost reports and data "shall be considered true and correct" does not imply that they have been audited or must be considered to have been audited. Although audits "may take a range of forms" (*Kaiser, supra,* 54 Cal.App.4th at p. 1559), they definitionally involve "a formal examination of an organization's or individual's accounts or financial situation," or "a methodical examination and review." (Merriam-Webster Dict. Online (2023) <https://unabridged.merriam-webster.com/collegiate/audit> [as of April 18, 2023].) Nothing in section 14170 suggests the Legislature intended for unaudited cost reports or data to be "deemed audited" after three years, and nothing requires the Department to

15

take any particular action with respect to such reports or data. Section 14170 thus fails to establish the existence of a clear, present, and ministerial duty on the Department's part to act in a particular way, or a clear, present, and beneficial right to performance of that duty on Crestwood's part. (*Professional Scientists, supra,* 195 Cal.App.4th at p. 1236.)[8]

Crestwood argues our interpretation of section 14170 would conflict with the State Plan.[9] We perceive no conflict. Unaudited cost reports and data are "considered true and correct" after three years in the limited sense that they are no longer subject to being audited under section 14170. (See *Robert F. Kennedy Medical Center v. Belshé* (1996) 13 Cal.4th 748, 756 ["the statutory language [of § 14170, subd. (a)(1)] reflects an apparent legislative intent simply to require the Department to perform an audit within three years from the date of the filing of the provider's cost reports"].) That does not mean unaudited cost reports and cost data become audited with the passage of time. If that were so, QASP payments could be calculated using bed days that had never been formally examined or methodically reviewed, which would violate the State Plan.[10] (See

---

[8] Crestwood does not argue the language of section 14170, subdivision (a)(1) is ambiguous. We therefore decline to consider Crestwood's argument that extrinsic evidence supports an alternate interpretation of the statute. (*Williams v. Superior Court* (2001) 92 Cal.App.4th 612, 623 ["Courts may look to extrinsic evidence to construe a statute only when the statutory language is susceptible of more than one reasonable interpretation"].)

[9] Crestwood also suggests that its reported STP days may have been audited after all. This argument has been forfeited. The trial court specifically found that Crestwood's STP days were *not* audited, and Crestwood does not argue the evidence was insufficient to support the finding. (*Delta Stewardship Council Cases* (2020) 48 Cal.App.5th 1014, 1075 [when an appellant raises an issue "but fails to support it with reasoned argument and citations to authority, we treat the point as forfeited"].)

[10] Again, the State Plan provides that only audited bed days are used to calculate QASP payments. STP days are not audited; therefore, they are not used to calculate QASP payments.

16

*County of San Luis Obispo v. Superior Court* (2001) 90 Cal.App.4th 288, 292

[" 'Mandamus will not lie to compel the performance of any act which would be void, illegal or contrary to public policy' "].) Such an interpretation would create the very conflict Crestwood urges us to avoid.

Crestwood also argues that excluding STP days from QASP calculations would create "absurd results." This is so, Crestwood says, because the Department could refuse to audit any and all cost reports, and thereby avoid making any QASP payments. We need not address such hypothetical scenarios because they are not before us. Even so, we note the State Plan requires the Department to audit skilled nursing facilities "a minimum of once every three years." Thus, the Department would not have discretion to refuse to conduct any audits at all. Under the circumstances, we do not believe that our construction of section 14170 would be likely to produce absurd results.

For all of the foregoing reasons, we conclude section 14170, subdivision (a)(1) does not impose a mandatory and ministerial duty on the Department to deem unaudited cost reports and data as having been audited after three years. It follows that the Department does not have a mandatory and ministerial duty to include unaudited STP days in QASP calculations.[11] We therefore reject Crestwood's contention that writ relief should have been granted to compel the performance of a mandatory, ministerial act.

2.      *Abuse of Discretion*

Crestwood next argues the Department's practice of excluding STP days from QASP calculations constitutes an abuse of discretion.[12] Although not entirely clear,

---

[11] As the trial court observed, the only mandatory and ministerial duty suggested by the petition is the duty to comply with the State Plan, and the State Plan says only audited bed days are used to calculate QASP payments.

[12]  Contrary to Crestwood's contention, the petition in the Crestwood action does not allege any abuse of discretion by the Department. We note, however, that the petitions in the West Anaheim and South Coast actions mention an alleged abuse of discretion, albeit

17

Crestwood appears to argue that an abuse of discretion occurred because the Department mistakenly believed and unsuccessfully argued that STP days were exempt from the QASP program under section 14126.022 and/or excluded by California Code of Regulations, title 22, section 51511.1. Crestwood also appears to argue the Department abused its discretion in choosing not to audit STP days. Neither argument is persuasive.

While "traditional mandate will lie to correct abuses of discretion, a party seeking review under traditional mandamus must show the public official or agency invested with discretion acted arbitrarily, capriciously, fraudulently, or without due regard for his rights, and that the action prejudiced him." (*Gordon v. Horsley* (2001) 86 Cal.App.4th 336, 351; see also *Carrancho v. California Air Resources Board* (2003) 111 Cal.App.4th 1255, 1265 ["Mandamus may issue to correct the exercise of discretionary legislative power, *but only* if the action taken is so palpably unreasonable and arbitrary as to show an abuse of discretion as a matter of law"].) We cannot say the practice of excluding STP days from QASP calculations constitutes an abuse of discretion.

Here, though the trial court may have rejected some of the Department's reasons for excluding STP days, the court accepted another reason as dispositive, and so do we. As previously discussed, the State Plan provides that only audited bed days may be used to calculate QASP payments. The trial court found, and substantial evidence supports, that STP days are not audited. The Department could not exercise discretion to include unaudited STP days in QASP calculations because doing so would have violated the State Plan. The provisions of the State Plan being mandatory, the Department was not free to choose some other approach to calculating QASP payments. (*Mission Hospital Regional Medical Center v. Shewry, supra,* 168 Cal.App.4th at p. 470.) The Department

only briefly, and appellants suggest they could amend the petitions to clarify that they seek writ relief to correct the alleged abuses. Accordingly, we will again exercise our discretion to consider Crestwood's untimely arguments.

was instead obliged to follow the approach spelled out in the State Plan.[13]  (*Ibid.*)  That approach implicitly foreclosed the possibility of STP days being included.  The Department thus reasonably determined that STP days could not be used to calculate QASP payments.  (*Ibid.*)  That the Department may have offered or entertained other, less convincing explanations for excluding STP days does not establish any prejudicial abuse of discretion.

Crestwood next argues the Department abused its discretion by choosing not to audit STP days.  Again, we disagree.  The trial court received evidence that STP days are not audited because they are not used for rate setting purposes.  That evidence was undisputed.  Given that STP days are not used for rate-setting purposes, there is nothing unreasonable about not auditing them during rate-setting audits.  The Department could reasonably exercise discretion to decline to audit STP days.[14]

"With more than 2,000 providers submitting cost reports, the Department does not have enough resources to conduct a comprehensive audit of each Medi-Cal provider.  In some cases, an audit may consist of a desk review and acceptance of the cost report as filed. . . .  In other situations, a more comprehensive audit may be required.  It is left to the Department to determine the scope of audit required in any particular case." (*Kaiser, supra,* 54 Cal.App.4th at p. 1559.)  Here, the Department acted within its discretion in declining to audit STP days that would not be used for rate setting purposes, and

_____

[13] Again, Crestwood's petition does not purport to challenge the State Plan.

[14]  The Department suggests the reason that STP days are not used in rate setting can be found in the State Plan, which provides:  "Freestanding STP facilities are excluded from the determination of freestanding [nursing facility] rates due to their different staffing requirements and the complexity of their reporting costs by level of care and services.  The cost reports for these facilities often comingle the data related to [nursing facility], Short-Doyle [Mental Health Medi-Cal Program,] and special county programs."

19

choosing, instead, to rely on audited bed days that could be drawn from readily available rate setting audit reports. No abuse of discretion appears.

## C.    *West Anaheim and South Coast Actions*

As previously discussed, appellants' opening brief focuses almost entirely on the Crestwood action and makes little mention of the West Anaheim or South Coast actions. Indeed, the argument section of the opening brief mentions the West Anaheim and South Coast actions only once, in a footnote. That footnote reads, in pertinent part: "Petitioner can amend their Petition here to clarify allegations that the Department abused its discretion by failing to count STP days and/or audit STEP [*sic*] days, and thus to include STP days in the QASP calculation. . . . In addition, allegations can be added that clarify that the Department further abused its discretion by formulating and relying on an erroneous legal conclusion whereby STP days were exempt from the QASP Program." These afterthoughts fail to demonstrate error. (See Cal. Rules of Court, rule 8.204(a)(1)(B) [appellant must ["[s]tate each point under a separate heading or subheading summarizing the point"]; *Pizarro v. Reynoso* (2017) 10 Cal.App.5th 172, 179 ["Failure to provide proper headings forfeits issues that may be discussed in the brief but are not clearly identified by a heading"].)

In any case, we have already rejected the same arguments in the context of the Crestwood action. We therefore conclude that West Anaheim and South Coast have failed to carry their burden of showing that the trial court abused its discretion in sustaining the Departments demurrers without leave to amend. (*Blank v. Kirwan, supra,* 39 Cal.3d at p. 318; *T.H. v. Novartis Pharmaceuticals Corp.* (2017) 4 Cal.5th 145, 162.)

## III.  DISPOSITION

The judgments are affirmed.  Respondents shall recover their costs on appeal. (Cal. Rules of Court, rule 8.278(a)(1) & (2).)


/S/

RENNER, J.



We concur:


/S/

HULL, Acting P. J.


/S/

McADAM, J.*


* Judge of the Yolo County Superior Court, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.

21