Filed 9/27/23  Clinicas del Camino Real v. Baass CA3

## NOT TO BE PUBLISHED

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

THIRD APPELLATE DISTRICT

(Sacramento)

----

| | |
|---|---|
| CLINICAS DEL CAMINO REAL, INC., | C095603 |
| Plaintiff and Appellant, | (Super. Ct. No. 34-2020-80003484-CU-WM-GDS) |
| v. | |
| MICHELLE BAASS, as Director of Department of Health Care Services, etc., et al., | |
| Defendants and Respondents. | |

Plaintiff and appellant Clinicas del Camino Real, Inc. (Clinicas) operates health care clinics in Ventura County.  It applied to the state Department of Health Care Services (Department) for an adjustment to its reimbursement rate for providing services to Medi-Cal beneficiaries at 11 of its clinics.  The Department denied the requests for 10 of the clinics.  Thereafter, Clinicas pursued an administrative appeal and the Department adopted the administrative law judge's (ALJ) decision denying the appeal because Clinicas's reimbursement applications were untimely and unmeritorious.  The trial court denied Clinicas's petition for writ of administrative mandate.

1

We reverse in part and affirm in part.  The Department waived its affirmative defense based on the applications' timeliness, and it must consider the applications on their merits.  But we affirm the Department's denial of the applications for the acquisition and use of data analytics software, and we hold that the Department did not abuse its discretion by relying in part on a federal Medicare policy manual to reach its decision.

FACTS AND HISTORY OF THE PROCEEDINGS

A.    Legal background

The Medicaid program provides federal funding assistance to states that choose to reimburse certain costs of medical treatment for needy persons.  (*Mission Hospital Regional Medical Center v. Shewry* (2008) 168 Cal.App.4th 460, 469.)  California participates in the Medicaid program through its Medi-Cal program.  (*Id*. at p. 474; Welf. & Inst. Code, § 14000 et seq. [statutory section citations that follow are found in the Welfare and Institutions Code unless otherwise stated].)  The Department administers Medi-Cal.  (*Mission Hospital*, at p. 474.)

For purposes of Medicaid law, Clinicas is a federally qualified health center (FQHC).  FQHCs are nonprofit entities certified by the federal government to provide primary and preventative health care to underserved and uninsured populations.  (See 42 U.S.C. § 254b(a)(1).)  When FQHCs provide services to Medi-Cal beneficiaries, the state reimburses them based on a fixed, all-inclusive, per-visit rate.  (§ 14132.100, subd. (c).)  Once established, the rate may be adjusted in two ways.  The rate is adjusted annually for inflation.  (§ 14132.100, subd. (d).)  Also, an FQHC may apply to the Department for an adjustment "based on a change in the scope of services provided[.]" (§ 14132.100, subd. (e)(1).)

To apply for a rate adjustment, an FQHC files with the Department a Change in Scope-of-Service Request (CSOSR).  To qualify for a rate adjustment, the FQHC must show in the CSOSR that it experienced at least one of nine qualifying or triggering events

2

described by statute that qualify as a change in the scope of its services. (§ 14132.100, subd. (e)(2)(A)-(I).) If the FQHC experienced a qualifying event, it must also establish that its change in costs satisfies four additional conditions required by statute. (§ 14132.100, subd. (e)(3)(A)-(D).)

CSOSRs are subject to a filing deadline. By statute, a CSOSR is timely filed if it is filed within 150 days from the beginning of the FQHC's fiscal year following the year in which the change of service occurred. (§ 14132.101, subd. (a).) For changes of service that occurred earlier than the prior fiscal year, the CSOSR must be filed within 90 days of the beginning of any fiscal year. (§ 14132.100, subd. (e)(4).)

If the Department denies a CSOSR, the FQHC may appeal that decision by requesting an administrative hearing. (Cal. Code Regs., tit. 22, §§ 51017, 51022(a).) Following the hearing, the hearing officer must submit a proposed decision to the Department's director, who may adopt or reject the decision or refer it back to the hearing officer to take additional evidence. (Cal. Code Regs., tit. 22, § 51044(a), (b).) The director's final decision is subject to judicial review pursuant to section 1094.5 of the Code of Civil Procedure. (§ 14171, subd. (j).)

B.     Clinicas's CSOSRs

Clinicas submitted CSOSRs to the Department for 11 of its clinics on November 30, 2016. Clinicas's fiscal year begins on July 1. November 30 is 152 days after the beginning of Clinicas's fiscal year. At the time Clinicas submitted its requests, however, the Department had an informal practice of allowing CSOSRs to be filed up to five months after the start of the fiscal year.

In its CSOSRs, Clinicas stated its clinics had changed their scope of services, and that those changes met the requirements of three of the statutory qualifying events for a reimbursement rate adjustment. Clinicas stated the changes qualified as a change in the scope of service due to amended regulatory requirements or rules, a change in types of

3

services due to a change in applicable technology and medical practice, and changes in operating costs attributable to capital expenditures associated with a modification in the scope of services. (§ 14132.100, subd. (e)(2)(B), (D), (G).)

Specifically, Clinicas stated that in 2015, it changed its scope of services due to regulatory requirements related to Medi-Cal managed care obligations. The Department had earlier designated a local agency, Gold Coast Health Plan (Gold Coast), as the only Medi-Cal managed care plan for Ventura County. As a result, Clinicas had to contract with Gold Coast to provide services to its Medi-Cal managed care members. Clinicas entered into a contract with Gold Coast in 2011. Doing so resulted in Clinicas having to provide additional services and incur increased costs in 2015. These services included performing additional tasks to meet performance standards, submitting new reports, implementing improvement and management programs, and establishing a system to refer patients for specialist services.

Clinicas also stated in its CSOSRs that its clinics had changed their scope of services due to Clinicas's certification in 2011 and 2015 as a Patient Centered Medical Home (PCMH). PCMH is a model of patient care delivery that uses a team-based approach by assigning a team of care providers to individual patients to manage the patient's medical needs.

Clinicas purchased two data analytics software systems in 2016 to enable it to perform these tasks. The software also facilitates medical record review by analyzing a patient's medical records and identifying a patient's medical needs, such as health screenings, and whether the patient followed up on prior referrals. The software creates a report identifying those needs and which the medical team reviews prior to the patient's appointment.

Clinicas declared in the CSOSRs that in addition to satisfying three of the statutory qualifying events, the changes in its scope of services also satisfied the four additional statutory conditions required to be met for a rate adjustment. Those conditions

4

required that the increase in costs was attributable to an increase in the scope of services as specifically defined; the cost was allowable under Medicare reasonable cost principles; the change in the scope of services was a change in the type, intensity, duration, or amount of services or any combination thereof; and the net change in the FQHC's rate equaled or exceeded 1.75 percent for the affected FQHC site. (§ 14132.100, subd. (e)(3)(A)-(C).)

On January 24, 2018, approximately 14 months after Clinicas submitted its CSOSRs, the Department approved Clinicas's CSOSR for one of the clinics and denied the CSOSRs for the remaining 10 clinics. The Department determined that none of the changes and expenditures constituted a qualifying event for a reimbursement rate adjustment. The additional services were not mandated by any amended regulatory requirement, nor did they constitute a change in technology, and they were not associated with the acquisition of a capital expenditure. Because Clinicas had not satisfied the qualifying conditions, the Department did not analyze whether Clinicas had also satisfied the four additional conditions. The Department did not mention in its decision the CSOSRs' untimeliness.

C. Administrative appeal

Clinicas appealed the decision. In its appeal, Clinicas identified a fourth qualifying event for the first time: a change in service intensity due to changes in the types of patients served. (§ 14132.100, subd. (e)(2)(E).) Due to the federal Affordable Care Act's expansion of Medicaid to adult populations who had not previously been eligible for the program, Clinicas began to treat a large adult population that had significantly different, more intense, and more expensive health care needs than the pre-Affordable Care Act Medicaid population, which tended to be under the age of 21.

The Department, in its pre-hearing brief, stated the appeal was "limited to the issue of whether [Clinicas] experienced a triggering event that would entitle it to an

examination of costs under Section 14132.100(e)(3)(A), which may result in an increased [per-visit] rate."

A five-day evidentiary hearing was held. During cross-examination of a Department auditor, the ALJ began asking questions about the 150-day time limit. The auditor testified that despite the 150-day time limit, the Department had been accepting CSOSRs up to five months after the fiscal year ends. The auditor stated that for that reason, Clinicas's CSOSRs were filed timely. We describe the testimony and arguments during the evidentiary hearing on this issue in detail below.

After the hearing was over and the record was closed, the Department in its closing brief raised the timeliness of the CSOSRs for the first time. The Department argued that the CSOSRs were barred because they were filed beyond the 150-day deadline. The Department claimed its processing of Clinicas's CSOSRs on the merits did not estop it from raising a statute of limitations defense where the estoppel would thwart important public policies.

Clinicas addressed the timeliness issue in its reply to the Department's closing brief. It argued that given the Department's practice of accepting late CSOSRs, rejecting Clinicas's CSOSRs now for untimeliness would be arbitrary and capricious, and the Department should be estopped from asserting the defense. Clinicas also argued that the Department by its actions had waived timeliness as a defense.

The ALJ denied the appeal. He stated he could not by law affirm the Department's acceptance of untimely-filed CSOSRs, and he found that the Department's raising the timeliness defense was not arbitrary or capricious.

The ALJ also rejected Clinicas's estoppel argument. Clinicas had presented no evidence showing it knew of and relied on the Department's informal practice of accepting CSOSRs up to five months into the new fiscal year despite knowing that "[t]he late filing was a concern to the tribunal and the parties were allowed the opportunity to present evidence and arguments with regard to this concern." A month and a half had

6

passed between the hearing day when the ALJ questioned the auditor about the time limit and the next hearing date. The ALJ stated that given this delay, Clinicas had time to prepare and address his concerns. Also, before he closed the hearing record, he asked the parties several times if they had anything additional to offer; nothing further was offered. The ALJ stated, "If [Clinicas] had known of the informal practice and then relied on it, it could have presented a witness to so testify. It did not." And the fact that the Department approved one of the 11 untimely CSOSRs did not establish Clinicas knew of the informal policy and relied upon it, or that Clinicas did not know of the actual requirement. Clinicas thus did not establish equitable estoppel. The ALJ did not address Clinicas's argument that the Department waived the 150-day statute.

Turning to Clinicas's specific claims, the ALJ denied the requests for adjusting the rate for changes in the managed care contract and the implementation of the PCMH model of care as untimely in their own right. Clinicas entered into the managed care contract with Gold Coast in 2011 and was certified as a PCMH in 2011 and early 2015. The ALJ ruled that these changes occurred before the prior fiscal year, and thus the CSOSRs based on those changes were untimely as they were filed more than 90 days after the commencement of the current fiscal year.

The ALJ rejected the CSOSR for the purchase and implementation of the data analytics software because the acquisition did not satisfy one of the additional statutory conditions for receiving a rate adjustment. One of the additional conditions requires that the increase in costs be attributable to an increase in the provider's scope of services. (§ 14132.100, subd. (e)(3)(A).) "Services" refer to physician's services and services furnished as an incident to a physician's services. (§ 14132.100, subd. (a); 42 U.S.C. §§ 1396d(l)(2), 1395x(aa)(1).) The ALJ found that data analytics software did not qualify as a service performed by a physician or a service incident to a physician's services.

7

Finally, the ALJ rejected Clinicas's request for an adjustment based on the expansion of Medicaid to adults under the Affordable Care Act. Clinicas did not assert this ground in its CSOSRs. The Department thus had made no finding on the issue, and, as a result, an appeal was not allowed on that basis.

The Department adopted the ALJ's decision as its final decision with insignificant amendments not relevant here.

### D. Mandate petition

Clinicas filed a petition for writ of administrative mandate and complaint for equitable relief challenging the Department's decision. The trial court denied the petition. Regarding the CSOSRs timeliness, it agreed with Clinicas that the 150-day statute was not jurisdictional. That conclusion, however, meant the Department had jurisdiction to determine the CSOSRs were untimely and to deny them on that basis. The court also agreed that the Department did not lack authority to accept CSOSRs beyond the 150-day limit and decide them on their merits. However, it concluded "reluctantly" that the Department was not prohibited from raising the timeliness of the CSOSRs in its closing brief, and the ALJ did not abuse his discretion in finding the CSOSRs were untimely.

The trial court was "deeply troubled" by how the timeliness issue was raised at the appeal hearing and that Clinicas had no reason or opportunity to present evidence at the hearing in support of its estoppel argument, the ALJ's comments notwithstanding. Nonetheless, the Department did raise the issue in its closing brief and Clinicas responded to it in its reply brief before the ALJ issued its decision. This petition was "thus *not* a case where the Court is being asked to affirm the Department's decision 'on a basis not embraced by the [Department] itself.' [(*Southern Cal. Edison Co. v. Public Utilities Com.* (2000) 85 Cal.App.4th 1086, 1111 [*Southern Cal. Edison*].)]"

8

Although this finding was dispositive, the trial court ruled on Clinicas's other arguments against the Department's decision on their merits. The court agreed with Clinicas that the ALJ had misapplied the 90-day limitations period against the claims involving the managed care contract and the PCMH certification. The ALJ wrongly focused on the fiscal year when the regulatory requirements were changed instead of the fiscal year when the change of service actually occurred in Clinicas's services, which in this case was the prior fiscal year as the 90-day limitations period required. The court usually would remand the matter for the ALJ to consider the merits of Clinicas's arguments, but because the CSOSRs were untimely, remand would be an idle act.

The trial court agreed with the ALJ that Clinicas did not establish that the acquisition of the data analytics software was attributable to an increase in the scope of a physician's services. The court also agreed with the ALJ that Clinicas was barred from raising for the first time on administrative appeal the Medi-Cal expansion to adult populations as an additional qualifying event.

DISCUSSION

I

*Standard of Review*

When reviewing the denial of a petition for writ of administrative mandate under Code of Civil Procedure section 1094.5, and where the trial court made no independent findings of fact, "we ask whether the public agency committed a prejudicial abuse of discretion. 'Abuse of discretion is established if the [public agency] has not proceeded in the manner required by law, the order or decision is not supported by the findings, or the findings are not supported by the evidence.' (Code Civ. Proc., § 1094.5, subd. (b); [citation].)" (*County of Kern v. State Dept. of Health Care Services* (2009) 180 Cal.App.4th 1504, 1510.)

9

When determining whether the administrative findings are supported by the evidence, we apply the same scope of review as the trial court. (*Hi-Desert Medical Center v. Douglas* (2015) 239 Cal.App.4th 717, 730.) We determine whether the agency's findings are supported by substantial evidence considering the whole record. (Code Civ. Proc., § 1094.5, subd. (c).) " ' "We do not reweigh the evidence; we indulge all presumptions and resolve all conflicts in favor of the [agency's] decision. Its findings come before us 'with a strong presumption as to their correctness and regularity.' [Citation.] We do not substitute our own judgment if the [agency's] decision ' " 'is one which could have been made by reasonable people . . . .' [Citation.]" ' " [Citations.]' (*California Youth Authority v. State Personnel Bd.* (2002) 104 Cal.App.4th 575, 584 []; accord, *Oak Valley Hospital Dist. v. State Dept. of Health Care Services* (2020) 53 Cal.App.5th 212, 224 [].) If a finding is supported by substantial evidence, we may not disregard or overturn it merely because a contrary finding would have been equally or more reasonable." (*Family Health Centers of San Diego v. State Dept. of Health Care Services* (2021) 71 Cal.App.5th 88, 97.)

The interpretation of a statute or regulation is a question of law. (*Family Health Centers of San Diego v. State Dept. of Health Care Services, supra*, 71 Cal.App.5th at p. 97.) "While an administrative agency's interpretation of the laws it is charged with enforcing may be entitled to deference, the court is the ultimate arbiter of the interpretation of the law." (*Ibid*.) Clinicas bears the burden of showing the Department prejudicially abused its discretion. (*Ibid*.)

II

*Untimeliness of the CSOSRs*

Clinicas contends the Department erred by denying its appeal based on the untimeliness of the CSOSRs. It argues that the Department waived asserting the 150-day rule as an affirmative defense by accepting, reviewing, and determining the merits of

Clinicas's CSOSRs without mentioning their timeliness until its closing brief after the evidentiary hearing on appeal had concluded. The Department had the chance to deny the CSOSRs for timeliness when it received them in 2016, and it should have done so then or in its 2018 denials instead of expending significant time and resources to evaluate them.

Clinicas also contends the trial court erred by upholding the denials based on timeliness. Quoting *Southern Cal. Edison, supra*, 80 Cal.App.4th at page 1111, Clinicas argues the Department's decision can be upheld only on a "a 'basis articulated by the [Department] itself,' " not by the ALJ or the Department's lawyers, and not by the Department on appeal. Where the Department itself stated in its prehearing brief that the appeal was limited to whether Clinicas met the requirements for a rate adjustment, allowing the Department to raise the timeliness issue in its post-hearing brief undermines the administrative process, is unfairly prejudicial, and, according to Clinicas, contrary to law. Clinicas does not contend before us that the Department was estopped from raising the defense when it did.

A.    Additional factual background

As stated earlier, the Department did not raise the 150-day time limit when Clinicas filed its CSOSRs or at any time before the administrative evidentiary hearing, nor did it raise the defense in its opening hearing brief. During the hearing, a Department auditor testified under cross-examination that the Department denied the rate adjustment for the managed care contract because the triggering event happened before the prior fiscal year and thus was untimely under the 150-day time limit. This statement piqued the interest of the ALJ, and he began asking questions about the time limit. He asked what the Department would do when a CSOCR was not timely filed. The auditor stated the Department would reject a CSOSR if it was filed beyond the 150-day limit.

11

Minutes later, the ALJ followed up on the issue. He asked about the timeliness of Clinicas's CSOSRs for the PCMH certification. The auditor stated the certification occurred prior to the 2015 fiscal year and the CSOSRs were submitted more than 150 days after the start of the next fiscal year. However, the Department had been accepting CSOSRs up to five months after the fiscal year ends. The auditor also mentioned the 90-day limitations period, but Clinicas's counsel pointed out that the 150-day limit was an exception to the 90-day limit. The ALJ then continued discussing the matter with counsel as follows:

"[ALJ]: All right. But in context it's almost, if you read the two together it's one way of thinking of it is, well, there's this time period. We'll give you more time under this other statute, and then according to this witness, even with that more time, in her opinion wasn't timely. Is that essentially your testimony?

"[Auditor]: Yes.

"[Counsel]: Yeah, but her testimony is also that it's the department's practice to accept them within five months. She also testified that there was an 11th change in scope that was submitted at the same time, and they audited it. The 2010 ones that we were looking at [earlier in the hearing], they were all dated and submitted on 11/30/2011, and they were all accepted and audited so . . .

"[ALJ]: Well, there's an argument that I would follow the statute over what might be just an informal or un-codified practice. I don't know. I mean, you could argue both sides of that.

"[Counsel]: That would seem a bit arbitrary and capricious if they are sometimes accepting them and sometimes not accepting them. The department has that obligation to treat all the health centers and all changes in scope in a consistent fashion, and it was not raised in the denial letter.

12

"[ALJ]: I can't do anything about the ones that aren't in front of me, um, but I do hear what you're saying. It does seem like if you do one, you could do the other. On the other hand, there's an argument that this is the rule here under this section."

Later that same day, the ALJ again asked questions about the 150-day time limit. The auditor explained that the rule required the change in the scope of service to have occurred in the prior fiscal year, and the CSOSR had to be filed within 150 days of the beginning of the current fiscal year. Asked by the ALJ if she thought Clinicas's CSOSRs were filed timely, the auditor stated they were filed timely even though they were filed three days after the 150 days had expired because the Department had been accepting CSOSRs if they were filed within five months of the end of the prior fiscal year. The CSOSRs were late, but the Department sometimes accepted them.

Neither the Department nor Clinicas introduced any further evidence at the hearing concerning the application of the 150-day time limit. As described above, the Department asserted the 150-day time limit for the first time in its closing brief after the evidentiary hearing had been closed, and the ALJ denied the appeal on that basis.

B.    Analysis

Waiver is "the intentional relinquishment or abandonment of a known right." (*Bickel v. City of Piedmont* (1997) 16 Cal.4th 1040, 1048.)  "Waiver requires an existing right, the waiving party's knowledge of that right, and the party's 'actual intention to relinquish the right.' ([*Id.*] at p. 1053.)  ' "Waiver always rests upon intent." ' (*City of Ukiah v. Fones* (1966) 64 Cal.2d 104, 107 [].)  The intention may be express, based on the waiving party's words, or implied, based on conduct that is ' "so inconsistent with an intent to enforce the right as to induce a reasonable belief that such right has been relinquished." ' [Citations.]" (*Lynch v. California Coastal Com.* (2017) 3 Cal.5th 470, 475.)

13

"Waiver differs from estoppel, which generally requires a showing that a party's words or acts have induced detrimental reliance by the opposing party. (See, e.g., *Feduniak v. California Coastal Com.* (2007) 148 Cal.App.4th 1346, 1359 [].) It also differs from the related concept of forfeiture, which results when a party fails to preserve a claim by raising a timely objection. (See *In re S.B.* (2004) 32 Cal.4th 1287, 1293, fn. 2 [].)" (*Lynch v. California Coastal Com., supra*, 3 Cal.5th at pp. 475-476.)

"Whether a waiver or forfeiture has occurred is often a factual question, typically reviewed for substantial evidence. (*Bickel v. City of Piedmont*, *supra*, 16 Cal.4th at pp. 1052-1053.) ' "When, however, the facts are undisputed and only one inference may reasonably be drawn, the issue is one of law and the reviewing court is not bound by the trial court's ruling." ' (*St. Agnes Medical Center v. PacifiCare of California* (2003) 31 Cal.4th 1187, 1196 [].)" (*Lynch v. California Coastal Com., supra*, 3 Cal.5th at p. 476.)

The facts surrounding the waiver issue are undisputed. Even though the CSOSRs were submitted untimely, the Department accepted them. It then spent over a year considering them and sought and received additional information concerning them. The Department ultimately denied the CSOSRs on their merits. It did not mention timeliness in its denials.

The evidence shows the Department knew of the 150-day time limit, and that it nonetheless accepted the CSOSRs as having been timely filed. Additionally, the ALJ expressly found, and neither party disputes, that the Department had an informal practice of allowing providers to file CSOSRs up to five months after the start of the fiscal year, even if the filing was past the statutory time limit of 150 days. The Department did not raise the timeliness issue in its pre-hearing brief, nor introduce any evidence on the issue at the hearing. Instead, it stated the appeal was limited to whether Clinicas experienced a triggering event.

It was the ALJ who raised the timeliness issue, and he did so during cross-examination of a Department witness. There is no evidence in the record that the Department at any time before the ALJ closed the evidentiary hearing informed Clinicas it intended to raise the 150-day time limit as an affirmative defense. The Department first raised the defense in its post-hearing closing brief, which was filed after the hearing was over and the record had been closed.

Only one inference may reasonably be drawn from these undisputed facts: the Department waived the 150-day time limit as an affirmative defense. The Department's ongoing practice of accepting and deciding CSOSRs filed within five months of the beginning of the fiscal year and its conduct from the filing of Clinicas's CSOSRs to the conclusion of the evidentiary appeal hearing was so inconsistent with an intent to enforce the 150-day time limit as to induce a reasonable belief that the Department had relinquished its right to raise the time limit as an affirmative defense. (See *Lynch v. California Coastal Com., supra*, 3 Cal.5th at p. 475.) That the issue was first raised by the ALJ and not by the Department further indicates the Department had no intent to apply the 150-day time limit, at least until after the hearing was closed and Clinicas was foreclosed from introducing evidence on the issue.

The Department contends there is no evidence it made "a knowing decision to waive any statutory provisions," and that "upon recognizing the application of the statute, the Department properly sought its application." This argument is unconvincing in the extreme. Where the Department's auditor testified the Department had a practice of not enforcing the 150-day time limit and of accepting CSOSRs filed within five months of the fiscal year's beginning, the Department cannot credibly claim or imply it did not recognize the statute's potential application in this matter until the ALJ raised the issue. It would appear the Department saw the question of timeliness, under the circumstances, here to be a non-issue until being given an opening by the ALJ.

15

The relevant issue here concerns the Department's intent to waive. As explained, the intent to waive the affirmative defense may be either express or implied. The Department does not address whether its conduct could induce a reasonable belief that it had waived the time limit. Instead, it contends it raised the argument "during the administrative proceedings," and if whether it waived the time limit is doubtful, courts should decide against waiver. (*City of Ukiah v. Fones, supra*, 64 Cal.2d at p. 108.)

We acknowledge that neither party has cited to case authority that addresses waiver in this administrative context where the affirmative defense is first raised after the evidentiary hearing has closed, and we have found none. Nevertheless, a defense in an administrative proceeding based on the expiration of a statute of limitations may be waived. (See *Colonial Ins. Co. v. Industrial Accident Com.* (1945) 27 Cal.2d 437, 440-441 [statute of limitations defense against claim for worker's compensation benefits may be waived by insurer as provided by statute].) And the undisputed facts convince us the Department never intended to enforce the 150-day time limit against Clinicas's CSOSRs, at least not until Clinicas had no time to prepare its case to rebut the defense.

In judicial proceedings generally, affirmative defenses must be separately pleaded in the defendant's answer or else they are waived. (*California Academy of Sciences v. County of Fresno* (1987) 192 Cal.App.3d 1436, 1442.) Where "something is relied on by the defendant which is *not put in issue by the plaintiff*, then the defendant must set it up. . . . [¶] . . . A plaintiff comes to court prepared to prove his case and to meet affirmative defenses pleaded in the answer. He could not be expected to meet special defenses which are not pleaded and has a right to be protected against them." (*Jetty v. Craco* (1954) 123 Cal.App.2d 876, 880.) "Just as the defendant is entitled to proceed with the knowledge that causes of action will not be asserted at trial that do not appear in the complaint, the plaintiff is entitled to assume that affirmative defenses omitted from the answer will not be asserted." (Carr & Schwing, 1 Cal. Affirmative Defenses (2d ed. 2023) § 1.5.)

16

We recognize that the procedures governing appeals to the Department from a final audit report do not require the Department to file a responsive pleading like an answer in judicial proceedings. (Cal. Code Regs., tit. 22, §§ 51016-51044.) Nevertheless, the arguments supporting the doctrine of waiver apply equally in these administrative proceedings to ensure the provider is given a fair hearing and is not prejudiced by late defenses for which the provider had no time to prepare an opposition, evidentiary or otherwise. We need not decide where in the hearing process the affirmative defense must be asserted to avoid waiver, but in this case, allowing the Department to raise the timeliness defense for the first time after the evidentiary hearing had closed unduly prejudiced Clinicas. We thus conclude the Department prejudicially abused its discretion by denying the CSOSRs based on an affirmative defense of timeliness which it had waived.

Clinicas also contends the Department's raising the 150-day time limit after the evidentiary hearing was an impermissible post hoc litigation strategy. Because we have found waiver, we need not address this argument.

III

*Data Analytics Software*

Clinicas contends the Department and the trial court erred in concluding that the acquisition and use of the data analytics software did not qualify for a reimbursement rate adjustment because it did not satisfy one of the statutory requirements. Under that requirement, the increase in costs must be attributable to an increase in the scope of services as defined in federal law; namely, physician services and services and supplies incident to physician services. (§ 14132.100, subds. (e)(3)(A), (a).)

A.      Background information

Clinicas purchased the data analytics software to assist in fulfilling its obligations under the managed care contract and its PCMH certification. It also used the software to

17

facilitate medical providers' review of patient records. The software analyzes a patient's medical records and identifies a patient's medical needs, such as health screenings, and whether the patient followed up on prior referrals. The software creates a report, called a gap report, that identifies those needs, referred to as "care gaps." The medical team reviews the report prior to meeting with the patient.

The report, for example, would identify whether a particular patient was due for a mammogram or a vaccine. The trial court explained, "The idea behind the software is that even if a patient comes in for a completely unrelated issue (for example, an ear infection), the physician can quickly identify and cure the patient's care gaps (for example by scheduling a mammogram, tetanus shot, or blood sugar test)."

Before the new software was implemented, the physician would have to review the patient's medical records to identify care gaps and treatment needs. After the software was implemented, Clinicas did not increase the length of patient visits, which remained at 15 minutes. A data analytics team performed the data analytics, not a physician. The data analytics team does not report directly to the physician or meet with a physician. It works at a centralized data center and not at locations where patients are seen.

The ALJ denied the CSOSRs for the data analytics software. He determined the software did not qualify as physician services because it was not a service performed by a physician or another qualifying health care professional. It was performed and its reports were prepared by a data analytics team.

The ALJ also determined that the software was not a service or supply "incident to" physicians' services. The data analytics services were not performed in the physician's office, but in centralized data centers. Physicians did not directly oversee the performance of the data analytics function, and the data analytics team did not report directly to a physician. To reach this conclusion, the ALJ relied on the applicable federal

18

statutes as well as a description of "incident to" services found in the Center for Medicare and Medicaid Services's Medicare Benefit Policy Manual, Publication 100-2.

Clinicas argued that by physicians reviewing the gap reports and relaying information to patients from them, there was an increase in the amount and intensity of services provided by the physicians and that the software's costs were attributable to that increase in service intensity.

The ALJ, however, found that the increase in costs was not attributable to an increase in the scope of physicians' services. Clinicas did not hire any additional physicians to perform this service. Its physicians were performing the same functions of reviewing medical records, counseling patients, and making referrals as they had before. The cost increase was attributable to the data analytics, which was not a qualifying service. Although the software may enhance physicians' services by providing more and better information to the patients, the physicians were nonetheless performing the same essential tasks, and the cost was for a program that to some extent reviewed records and identified treatment needs in place of the physician. Thus, the costs could not be attributable to an increase in the scope of physicians' services.

Moreover, since its inception as an FQHC, Clinicas has been obligated to perform the case management services that the data analytics software facilitates. As part of the scope of its services, Clinicas has been required to review patient medical records, identify needed medical care, make appropriate referrals, and follow up on those referrals. These are the same services the software provides. The ALJ found that the performance of these services by the software, even if done more efficiently than before the software was purchased, does not constitute an increase in the scope of Clinicas's services within the meaning of section 14132.100, subdivision (e)(3)(A).

The trial court sustained the ALJ and the Department's ruling. Under section 14132.100, subdivision (e)(3)(A) and (C), an increase in costs could not support a rate adjustment unless the increase was "attributable to, or caused by, an increase in the type,

19

intensity, or amount of services provided." The cost of purchasing and using the software "was not caused by an increase in the scope of services – instead, something like the reverse is true (i.e., the increase in the scope of services was attributable to the software)." The software made it easier for physicians to do what they were always required to do—review patients' medical records and identify their treatment needs. Thus, the increased cost was not attributable to an increase in the scope of the physician's services.

B.    Analysis

Clinicas contends the ALJ and the trial court erred as a matter of law. It argues that by requiring the cost increase to be "caused by" an increase in services, the decision forecloses proper rate adjustments based on qualifying events where the cost increase precedes the increase in services, such as the acquisition of the data analytics software. Clinicas claims the trial court's holding renders some of the qualifying events in section 14132.100, subdivision (e)(2) meaningless, such as changes in types of services due to a change in appliable technology, where the change results because of the purchase of the technology. (See § 14132.100, subd. (e)(2)(D).)

Clinicas further argues that the Department's ruling effectively bars rate adjustments for any investments in technology that increase and enhance physician services. Even if the software made the existing and essential task of caring for patients only more efficient, being more efficient qualifies as an increase in the scope of services and a change in the "type, intensity, duration, or amount of services" required by section 14132.100, subdivision (e)(3)(A) and (C). Otherwise, new medical technology could never qualify for a rate increase if the physicians are still essentially treating a patient. FQHCs would not modernize because they would not receive a rate adjustment for using new technology that assists in better caring for patients.

20

Clinicas also challenges the Department's finding that the new software did not qualify as a service furnished "incident to" a physician's services. It claims the Department, by relying in part on the Medicare Benefit Policy Manual to define "incident to" services, violated California law prohibiting the use of Medicare rules to interpret Medi-Cal unless those rules are specifically adopted or incorporated by the Legislature. (See *Tulare Pediatric Health Care Center v. State Dept. of Health Care Services* (2019) 41 Cal.App.5th 163, 172, 175 (*Tulare Pediatric*).)

Even if the Medicare rules apply, Clinicas claims the Department wrongly focused on the existence and technical function of the data analytics software and its physical location instead of focusing on the services provided to patients and whether the software increased those services and made providers more effective in providing care. The software increased the services a physician provides to a patient in the form of care gap services like vaccinations and mammograms that the data analytics identifies. Clinicas also claims the Department overlooked the changes in services that the managed care contract required which triggered the need for the software.

To establish a change in the scope of services to receive a reimbursement rate adjustment, the FQHC must show, among other additional conditions, that the change in costs is attributable to an increase or decrease in the FQHC's scope of services as defined in federal law. (§ 14132.100, subds. (e)(3)(A), (a); 42 U.S.C. § 1396d(a)(2)(C), (l)(2).) The relevant federal statutes, which are Medicare statutes, define an FQHC's services as including physicians' services, services and supplies furnished as an incident to a physician's professional service, and certain vaccines. (42 U.S.C. §§ 1396d(l)(2)(A), 1395x(aa)(1)(A)-(C).) Physicians' services are "professional services performed by physicians, including surgery, consultation, and home, office, and institutional calls . . . ." (42 U.S.C. § 1395x(q).) Services and supplies furnished as an incident to a physician's service are services and supplies which are commonly furnished in physician's offices and are commonly either rendered without charge or included in the physician's bills,

21

including drugs and biologicals which are not usually self-administered by the patient. (42 U.S.C. § 1395x(s)(2)(A).)

In short, to obtain an adjustment to its reimbursement rate, Clinicas was required to show that the increased costs it incurred by acquiring the data analytics software were attributable to an increase in the scope of its physicians' professional services or the services and supplies furnished incident to those professional services.

Initially, we address Clinicas's contention that the ALJ and the trial court misinterpreted the term "attributable" in section 14132.100, subdivision (e)(3)(A). " 'When we interpret a statute, "[o]ur fundamental task . . . is to determine the Legislature's intent so as to effectuate the law's purpose. We first examine the statutory language, giving it a plain and commonsense meaning. We do not examine that language in isolation, but in the context of the statutory framework as a whole in order to determine its scope and purpose and to harmonize the various parts of the enactment. If the language is clear, courts must generally follow its plain meaning unless a literal interpretation would result in absurd consequences the Legislature did not intend." ' " (*City of San Jose v. Superior Court* (2017) 2 Cal.5th 608, 616.) In its common understanding, "attributable" means "capable of being attributed." (*Merriam-Webster's Unabridged Dictionary*, Merriam-Webster, https://perma.cc/5MTS-56SS. Accessed 20 September 2023.) In turn, "attribute," in the sense used in the statute, means "to explain as caused or brought about by**:** to regard as occurring in consequence of or on account of; [such as] the collapse of the movement can be *attributed* to lack of morale[.]" (*Merriam-Webster's Unabridged Dictionary*, Merriam-Webster, https://perma.cc/9RQD-S4BN. Accessed 20 September 2023.)

Under these definitions, the plain language of the statute requires the FQHC to establish that the change in its costs was caused or brought about by or was on account of an increase or decrease in the scope of its physicians' professional services or the services and supplies furnished incident to those professional services.

22

The Department agrees with Clinicas that the term does not imply a particular order of causation but requires only a correlation between the increased cost and the increased service. We agree. To use the Department's example, if a FQHC decides to provide dental care, it will incur costs, such as hiring dentists and staff, before the service is actually provided. Nevertheless, the costs are attributable to the provision of the new service regardless of when the costs are incurred. They are on account of the new service. The order of events is not determinative.

In its main argument, Clinicas in effect argues that the data analytics software increased the scope of services provided by its physicians because it improved or made more efficient the services they were providing which led to more care gap services being provided. It claims the software changed the scope of the services being provided because the software changed "how patient encounters occur."

The Department contends that is not enough. Under its interpretation of the statutes, Clinicas's increased cost must result from expanding its physician services or offering additional services, not from just improving existing services or changing the method for providing them.

There is no doubt that a physician's consulting with a patient qualifies as a physician's service. (42 U.S.C. § 1395x(aa)(1)(A), (q).) This would include consulting with a patient about care gap and other medical needs and arranging for those needs to be met. There is al no dispute that FQHCs have been required to provide these consultation and preventive services since before Clinicas acquired the software. At issue, then, is whether providing the physician and, through the physician, the patient information about a patient's care more efficiently, quickly, and thoroughly on account of the data analytics software constitutes an increase in the "scope" of the physician's services. We agree with the Department and the trial court that the improved consultations facilitated by the data analytics software do not constitute an increase in the scope of physician services. Generally, the term "scope" in situations like this means "the general

23

range or extent of cognizance, consideration, activity, or influence <the synopsis is a very brief indication of the *scope* of the whole argument[>] . . . [or] the limited field or subject under consideration**:** the range of the matter being treated**:** the marked off area of relevancy[.]" (*Merriam-Webster's Unabridged Dictionary*, Merriam-Webster, https://perma.cc/5Z9V-PMTM.  Accessed 20 September 2023.)  An increase in the scope of physicians' services would mean the physicians added to their range or extent of services and were providing a new, additional, or different service which the physicians had not previously provided.  The software has not resulted in Clinicas's physicians providing a new or different service.

Interpreting the word "scope" as requiring a new or additional service is consistent with the other provisions of the statute.  Subdivision (e)(3) of section 14132.100 provides the four additional conditions FQHCs must satisfy to obtain a reimbursement rate adjustment.  Two of those conditions are relevant here.  Subdivision (e)(3)(A) is the condition the Department and the trial court found Clinicas did not satisfy:  "The increase or decrease in cost is attributable to an increase or decrease in the scope of" physician services and services incident to physician services.  The other relevant condition is subdivision (e)(3)(C), which reads:  "The change in the scope of services is a change in the type, intensity, duration, or amount of services, or any combination thereof."  Clinicas argues that providing services more efficiently due to the software has resulted in both an increase in the scope of services under subdivision (e)(3)(A) and a change in the "type, intensity, duration, or amount of services" under subdivision (e)(3)(C).

To avoid redundancy, which we are required to do when interpreting a statute, we must conclude that the two provisions address separate matters.  " ' "Words must be construed in context, and statutes must be harmonized, both internally and with each other, to the extent possible." [Citation.]  Interpretations that lead to absurd results or render words surplusage are to be avoided.' " (*People v. Loeun* (1997) 17 Cal.4th 1, 9.)  In this case, the increased cost must under subdivision (3)(A) be attributable to an

24

increase in the scope of physician services and services and supplies incident to those services, and under subdivision (3)(C), the change, or increase, in the scope of services must be a change in the type, intensity, duration, or amount of services provided.

We agree with Clinicas that the software is attributable in changes in the intensity of physician consultations and in the amount of information shared in consultations, but the statute also requires physician services to have increased on account of the software. We do not consider whether the change satisfies subdivision (e)(3)(C) until we first determine the change satisfies subdivision (e)(3)(A). If the software is not attributable to an increase in the physicians' scope of services, i.e., providing a new or additional service not previously provided, we need not determine whether the software satisfies subdivision (e)(3)(C). Substantial evidence in the record supports the Department's determination that the software was not attributable to an increase in physicians' services.

As for Clinicas's arguments under the "incident to" services prong, we disagree with Clinicas's claim that the Department erred by relying in part on the Medicare Benefit Policy Manual to determine the meaning of "incident to." Chapter 13, section 120.1 of the policy manual, which the ALJ cited, states that "incident to services and supplies" that are provided incident to a physician's visit must result from the patient's encounter with the physician. Such services and supplies must be provided by someone who has an employment agreement or a direct contract with the FQHC to provide services. "Incident to" services and supplies are generally limited to situations where there is direct physician supervision of the person performing the service. The physician need not be in the same room, but he or she must be in the FQHC and immediately available to provide assistance and direction.

Clinicas claims the Department, by relying on the policy manual, violated the rule of law announced in *Tulare Pediatric, supra*, 41 Cal.App.5th at pages 172, 175. Clinicas interprets *Tulare Pediatric* to hold that the Department, in administering Medi-Cal, cannot rely on Medicare rules unless the Legislature adopts or incorporates those

25

Medicare rules into Medi-Cal.  Clinicas argues the state incorporated into section 14132.100, subdivision (e)(3) Medicare's reasonable costs principles as one of the statutory additional conditions FQHCs must satisfy when applying for a rate adjustment (§ 14132.100, subd. (e)(3)(B)), but it incorporated no other Medicare standards for the remining additional conditions.  Thus, the ALJ erred in relying on them.

Assuming for purposes of argument that Clinicas's application of *Tulare Pediatric* is correct, the Department did not violate its rule.  Contrary to Clinicas's assertion, the additional condition imposed under section 14132.100, subdivision (e)(3)(A), that the change in cost be attributable to an increase in services, expressly incorporates Medicare law to define those services as physician services and supplies and services incident to physician's services.  As explained above, section 14132.100 defines the FQHC services it covers by incorporating Medicare statutes by reference.  (§ 14132.100, subd. (a), (e)(3)(A); 42 U.S.C. §§ 1396d(a)(2)(C), (l)(2), 1395x(aa)(1)(A)-(C), (q), (s)(2)(A).) Accordingly, the Department did not abuse its discretion by relying on those federal laws and the policy manual's further interpretation and application of those federal laws to determine whether the cost of the software was attributable to an increase in supplies and services incident to physician's services.  (See *Family Health Centers of San Diego v. State Dept. of Health Care Services* (2023) 15 Cal.5th 1, 12-13 [ALJ did not err by relying on Medicare manual for guidance on whether FQHC's costs were reimbursable].)

Clinicas concludes by arguing we should overturn the ruling on its CSOSRs for the data analytics software because "FQHCs that primarily treat medically vulnerable and underserved Medi-Cal patients should not bear the full cost of technology that enables them to provide the high-quality services that the Department demands."  We have no doubt that the software has improved Clinicas's services, but we are required to enforce the plain terms used in section 14132.100, subdivision (e), and those terms indicate the Legislature did not intend for this type of expenditure to be compensated through

26

adjustments in the reimbursement rate. Clinicas's argument is a matter of policy best raised to the Legislature.

Our holding comes with a caveat. Testimony at the evidentiary hearing disclosed that the data analytics software was used for more than just patient consultations. Clinicas claimed it was also instrumental in helping Clinicas satisfy reporting and care requirements imposed on it by its managed care contract and its PCMH certification. The ALJ did not address the CSOSRs as to those elements because it found them to be untimely, a finding the trial court reversed and which the Department has not challenged in an appeal. Because we are remanding the matter for the ALJ to consider the CSOSRs on their merits, that remand may necessarily include a determination by the Department of the extent to which the costs of the software may be attributable to an increase in the scope of physician services or supplies and services incident to physician services that are required under the managed care contract and the PCMH certification. We take no position on those issues in this appeal.

IV

*Increased Adult Patient Population*

Under section 14132.100, subdivision (e)(2), one of the events that qualifies as a change in the provider's scope of service (subject to the additional conditions in subdivision (e)(3)) is that the provider experienced an "increase in service intensity attributable to changes in the types of patients served, including, but not limited to, populations with HIV or AIDS, or other chronic diseases, or homeless, elderly, migrant, or other special populations." (§ 14132.100, subd. (e)(2)(E).) When Clinicas filed its CSOSRs, it did not assert it had experienced a change in its scope of services due to changes in its patient demographics.

To appeal the Department's denial of its CSOSRs, Clinicas filed a Statement of Disputed Issues (SODI) with the Office of Administrative Hearings and Appeals. In its

27

SODI, Clinicas asserted for the first time that its clinics had experienced a demographic change due to Medicaid expansion under the Affordable Care Act.

The ALJ rejected Clinicas's request for a rate adjustment based on the change in its patient demographics because Clinicas did not assert this ground in its CSOSRs. As a result, the Department had made no finding on the issue, and an appeal was not allowed on that basis. The trial court affirmed the ALJ's holding.

Clinicas contends the ALJ and the trial court erred. It argues the ALJ should have addressed the patient demographic issue because it raised the issue in its SODI. We disagree. The scope of the administrative appeal is limited to the Department's findings.

An FQHC may appeal a grievance or complaint concerning rate setting and scope of service changes in the manner established by the Department. (§§ 14132.100, subd. (o), 14171.) The administrative appeal process is "to review grievances or complaints arising from the findings of an audit[.]" (§ 14171, subd. (a).) The regulations governing the administrative appeal authorize a provider to request a hearing "to examine any disputed audit or examination finding" by filing an SODI. (Cal. Code Regs., tit. 22, § 51017.) The SODI must specify "each issue" in dispute and set forth the provider's contentions as to those issues. (Cal. Code Regs., tit. 22, § 51022(d).)

At the hearing, the Department is required to "present its audit findings and evidence" first. (Cal. Code Regs., tit. 22, § 51037(i).) The Department bears the burden of demonstrating by a preponderance of the evidence "that the audit findings were correctly made." (Cal. Code Regs., tit. § 51037(i).) Once the Department has presented a prima facie case, the burden of proof shifts to the provider to demonstrate by a preponderance of the evidence "that the provider's position regarding disputed issues is correct." (Cal. Code Regs., tit. § 51037(i).)

This process indicates that the administrative appeal concerns the Department's findings, and if the FQHC did not raise a particular ground of appeal in its CSOSR, there are no findings concerning that ground which may be reviewed in the administrative

28

hearing. Except for when amended audit reports or cost reports are filed while the appeal in pending, events that did not occur here, the administrative hearing regulations do not authorize a provider to raise, or the ALJ to resolve, new grounds of appeal on which the Department made no findings. (Cal. Code Regs., tit. 22, §§ 51019, 51020.) Thus, even though Clinicas raised the patient demographic issue in its SODI, because the Department did not issue findings on that issue, the ALJ did not have authority to resolve it. The ALJ and the trial court thus did not err in ruling the issue was not before them.

## DISPOSITION

The judgment is reversed in part and affirmed in part, and the matter is remanded for further proceedings consistent with this opinion.

The parties shall bear their own costs on appeal. (Cal. Rules of Court, rule 8.278(a)(3).)


                      _____

                      HULL, Acting P. J.


We concur:


_____

RENNER, J.


_____

MESIWALA, J.